## THE STATE v. MOORE, Appellant.

### Division Two, February 26, 1901.

1. **Homicide: CONFESSION: THREAT OF MOB VIOLENCE.** A confession procured by express or implied representations that it is the only way to protect accused from mob violence is not admissible.

2. ———: ———: ———: **CONFLICTING TESTIMONY: QUESTION FOR JURY.** Whether a confession was voluntary, or was procured by representations that it was the only way to save accused from mob violence, is a question for the jury.

3. ———: ———: **INSTRUCTION.** Where the evidence is conflicting as to whether a confession was voluntary, it is error to refuse to instruct as to the rules governing the admissibility of confessions.

4. ———: ———: **REQUEST FOR ERRONEOUS INSTRUCTION.** A request for an erroneous instruction is sufficient to require the court to instruct as to the questions presented by such erroneous instruction.

Appeal from Stoddard Circuit Court.—*Hon. J. L. Fort,* Judge.

REVERSED AND REMANDED.

*Wammack & Mozely* for appellant.

*Edward C. Crow,* Attorney-General, for the State.

SHERWOOD, P. J.—Charged. in the indictment with murdering his father, Jesse W. Moore, by shooting him with a shotgun, defendant being put on his trial, was found guilty of that charge, and sentenced to be hanged; hence this appeal.

Jesse W. Moore was killed on the sixteenth of November, 1899, while sleeping in his bed in a room of his dwelling house, and the weapon used was a double-barrelled shotgun belonging to him, and which was evidently but a few feet distant from the head and face of the victim at the time the gun was discharged. It seems that this discharge occurred about 3 or 3:30 a. m. In the room where the murder occurred, there were three beds; one occupied by the father, one occupied by his son the defendant, a boy about 19 years old, and the other by two small boys, his brothers, the younger some 7 years old.

There was a hall eight feet wide between the room already mentioned and the one occupied by the wife and mother, who had with her in the bed where she slept, a young child. A sister of defendant 15 years old also slept in the bed with her mother. The pants of Jesse W. Moore lay on the foot of the bed in which he had slept, and in one of the pockets, a pocket-book containing some sixty odd dollars in money was found undisturbed when the inquest was held.

Defendant stated when a witness at the inquest, and during the day of the inquest, that the report of the gun did not awaken him or any of the rest of the family. He did not deny making this statement, nor did he attempt explanation of how he knew the discharge of the gun did not awaken any of the rest of the family. Neither the wife and mother nor the daughter and sister testified at the trial.

A man named Huff had been taken from the county jail on the same night that Jesse W. Moore was killed, and hanged by a mob, and of this fact defendant became aware on the day of the inquest, on which day he was arrested.

Defendant afterwards confessed to J. W. Farris, the prosecuting attorney, so Farris states, that he had murdered his father by shooting him with the shotgun while he was asleep in bed. This confession is said to have taken place on Saturday night, the eighteenth of November, two nights after the homicide. Speaking of the confession and preceding and attendant on it, Farris says of defendant: "I had heard or understood that he desired to make a statement on Friday. Circuit court was in session. I was busy before the grand jury and in the court all day, and busy at nights and I couldn't find time to go over to talk to him. I also received the same word again on Saturday from different parties, from Sheriff Evans, as testified to, and also from Squire Mayes, that he was liable to make a confession. I don't remember what Squire Mayes said about it just now, but on Saturday I couldn't yet go. I was busy and told the sheriff that after I got my supper and a little rest I would come up town after supper and have a talk with the young man. So I came to the jail somewhere about 8 o'clock, I suppose, on Saturday night. Mr. Evans went up stairs and brought Mr. Elijah L. Moore down. I think Mr. Busby and his wife perhaps were somewhere about the jail. Perhaps they were in the other room. And Mr. Evans came down. I had the St. Louis Republic—I spoke to Lige and he spoke. He took a chair and sat down. Evans and he commenced a conversation. I took no part in that conversation at all at that time. I sat there and read my paper and listened to the conversation of the sheriff and the defendant Elijah L. Moore. Evans talked to him some ten or fifteen minutes, I presume, and finally I

dropped my paper and perhaps I put in ·a few words with him about the matter, and he says to Mr. Evans, 'I want to have a private conversation with Mr. Farris,' and asked Mr. Evans to go out of the room. Lige commenced the conversation with me and he and I talked for some little while, ten minutes I presume, may be fifteen, about the killing of his father. I says, 'Lige, the people in your county believe that you know something about who killed your father,' and I says, 'I believe it, too.' He at the time denied it. I asked him, then, how he could explain that he didn't hear the report of a shotgun fired off in the room in which he was sleeping? Well, I don't remember what his answer was to that. I says to Lige, 'If my wife were to be murdered to-night in the room where I was sleeping and I didn't hear the report of the gun, and I would get up the next morning and say to my neighbors that somebody has come and murdered my wife and I never heard the report of the gun, don't you believe that they would think that I murdered her?' Lige dropped his head, said, 'Yes, I think they would,' or something like that. Then I took the hired girl as an example. I says, 'Suppose the hired girl sleeps in another room and was shot with a shotgun and none hears the report and I would go out the next morning and say that some-one came there and murdered her and I nor my wife never heard the report of the gun, like you and your family say you never heard the report of no gun, don't you think the people would think I knew all about the shooting?' He still got weaker. Well, I talked with him on a strain along that line some ten minutes or more. And finally he says, 'Mr. Farris,' he says, 'I do know something about it. I do know,' he says, 'who done the shooting,' and there were tears in his eyes about that time. Now, I says, 'Lige, just tell the truth about it. The truth is all we want.' 'Well,' he says, 'My sister done it.' His 15 year old sister, called her name, I believe her name is

Mary; anyhow, he said his sister done it. I says, 'Lige, you say you didn't hear the gun fire, and you testified down there before the coroner's jury, and all of your folks did, that this gun had been missing for a period of ten days; now what do you say about where that gun was?' Lige says, 'Well, she had that gun hid behind the flour barrels in the kitchen.' I says, 'Lige, how many flour barrels were there in the room?' He says, 'There were four.' He says, 'My father only a few days before that,' and I believe he named himself, 'had been out to Dexter at Jorndt's Mill, and he had a lot of wheat deposited there,' so he said, 'and he got four barrels of flour and brought home.' I says, 'Tell me what particular part of the room and whereabouts this gun was hid.' He says, 'It was hid in the corner behind the very fartherst flour barrel from the eating table where we always eat.' I says, 'How did you keep the gun concealed from your father and mother?' He says, 'We throwed some old rags over it;' then he put an apron over it to keep it from being seen. 'Well,' I says, 'what time in the night now was it that your sister fired this shot?' He says, 'It was about three o'clock in the morning.' I says, 'Did you know she was going to fire it?' He says, 'No I knew she was going to kill him sometime, but I didn't know when it, was.' 'Now,' I says, 'Lige was that the first time that your sister ever fired a shotgun?' He says, 'Yes,' he says, 'it was.' 'Well now,' I says, 'Lige, that seems rather peculiar to me that a young girl who has never fired a gun before in her life would walk in there at night and get a gun out and shoot her father?' I says, 'It seems to me that she would be afraid to shoot the gun.' Then I says to him, 'I can't believe that you told me the truth. Now you tell it to me, Lige.' Then he dropped his head, and tears in his eyes again, and he says, 'No,' he says, 'my sister didn't shoot him.' He says, 'I will tell you the truth this time for sure, so help me God,' or something like

that. Then he says, 'O God, pity me,' something like that. He used so much praying words I can't tell you all he did say. 'I killed my poor old father myself,' he says; 'O God, if I had it back I wouldn't have done it for ten thousand dollars.' He says, 'If I had it back I wouldn't have done it the next minute after I done it at all for anything on earth.' 'Now,' I says, 'Lige, yor are telling me the truth this time, are you?' He says, 'Yes,' he says, 'I done it, but,' he says, 'I took the gun down myself out of the rack and gave it to my sister and she did hide the gun behind the flour barrel, but I got the gun and done the shooting myself.' 'Well,' I says, 'Lige, when was it this gun was hid there?' He says, 'On Sunday evening about ten days before the killing took place on Thursday morning.' I says, 'What time was it the gun was hid?' He says, 'Well, my father that Sunday evening about sundown or dusk went down to some neighbor's house—I don't know whether Mr. Manion's or who, somewhere close there'—he named the place, and says, 'My mother and the little children were out at the front gate picking up chips or kindling to start a fire with next morning.' He says, 'My sister was in the kitchen cooking supper.' He says, 'I went and took the gun down out of the rack where my gun and my father's gun was laying and another gun,' I believe, 'and I took the gun and I gave it to my sister at the kitchen door, and she took the gun and put it back behind this flour barrel and hid it and covered it up with these rags, as I told you, and,' he says, 'the gun stayed there till the killing took place on that Thursday night.' 'Now,' I says, 'Lige when did you aim to kill him?' He says, 'I aimed to kill him that Sunday night.' I says, 'Well, what prevented you from doing it?' He says, 'I went to sleep that night before pa came into the room and,' he says, 'I overslept myself and didn't wake up the next morning till he called me to go build fire and feed.' 'Well,' I says, 'why didn't you

State v. Moore.

kill him some other night during the week or before ten days expired?' 'Well,' he says, 'I aimed to but,' he says, 'I would. go to sleep and oversleep myself, and,' he says, 'some nights when I would think of it,' he says, 'my heart would just fail me.' He says, 'I couldn't get up courage enough to do it,' and then he would cry again. 'Well,' he says, 'I know it is awful bad, awful bad,' he says, 'I can't help it now.' He says, 'I hope my poor father is in Heaven.' He says, 'God knows though, he didn't treat me like I ought to have been treated.' 'Well,' I says, 'Lige, now just tell me whatever got you in the notion to want to kill your father?' 'Well,' he says, 'That my pa never did treat me right.' He says, 'I will tell you, Mr. Farris,' he says, 'I worked awful hard all my life on the farm there;' he says, 'I helped my pa to make what he has got;' he says, 'He never would buy me many clothes;' he says, 'He only bought me one suit of clothes this last summer; that was a cheap suit; I wanted a nice suit, I was big enough to go around with the girls.' He says, 'I wanted a good suit and he wouldn't buy it for me.' He says, 'My father told me if I stayed out late at night with the girls he would lock the door and make me sleep outdoors with the dogs and hogs.' He says, 'I was getting near grown and I wanted to stay out.' He says, 'My pa wouldn't let me go to shows, play-parties, nothing of that kind.' He says, 'I wanted to go to the show at Dexter and he wouldn't let me go,' and then he went on and said that he and his father had a racket one day. I think it was out about the barn, about thirty days before this killing took place. He said he went to the house and he told his ma then that he wished pa was dead. I says, 'Now, what did she say to you Lige; didn't she advise you not to do anything of that kind?' 'Well,' he says, 'Ma says, "Lige, don't you know you must never do that, that you will never know what a help your father is until he is dead," something of that

Vol 160 mo—29

kind.  He said that he said to his ma, 'Ma we can get along
better without him than we can with him anyhow.'  Then he
said sometime after that or before that, I don't remember which
now, that one night his pa and his ma were quarreling or
jowering in the room and that his pa picked up his shoe and
threatened to throw at his ma.  He says, 'I told him he had
better not do that.'  He says, 'If he had hit her with that shoe,
I would have killed him right then.'  To get back to where I
started again, he says, that evening that he hid the gun, that
his pa came back and that they all ate supper together and he
says, this Wednesday night or Thursday morning that the
shooting took place, that he was awakened by his little brother
or sister or the baby—one of the smaller children—crying, who,
he said, 'was sleeping with his mother in a room across the
hall, in the last room across the hall.'  He said that the baby
woke him up crying, and he said that after the baby hushed
crying that he lay there something like a half an hour.  I says,
'Now, Lige, you said it was about 3 o'clock; how do you know
it was about 3 o'clock?'  He says, 'Because I heard the clock
strike three,' and he says, 'Then I lay there about a half an
hour,' and says, 'I got up out of my bed, I went into the
kitchen and went by this flour barrel and got the gun and
came back into the room and shot him.'  I says, 'How close
were you to him when you fired the shot?'  He says, 'I had
the end of the gun,' and he measured it off on the stove pipe
joints in the jail there—Mr. Evans has a stove in the jail there
—he says, 'The point of the gun was about the length of one
of those stove-pipe joints from his head, about two feet, what-
ever it is;' he measured it off about the length of one of those
stove joints, stove-pipe joints, and he said after he shot him
that his little brothers, two of them, about seven and ten years
of age, and named Hance and Charley, I believe he sad their
names are, were sleeping in the same room that he and his

State v. Moore.

father were in, but in a different bed, and he said that Hance, the seven year old boy kind o' rose up in the bed and sat up in the bed and he said that Hance said to his brother Charlie, he says, 'Charlie, where are you?' Charlie says, 'Here I am.' Then he says that the boy laid down again. Then he said he took the gun and went back into the hallway and placed the gun up in the rack where it had always been kept, but he told me that he had discussed the fact of this gun being missed in the presence of his father and his mother two or three different times during the time it was hid that ten days till the shooting took place, and that he discussed it with his father and in the presence of his mother and sister, and that his father didn't know where the gun was. That conversation had happened, he said, but he said that he and his sister knew where it was all the time. Now, that is the story, gentlemen, that he told me on Saturday night. Then I called Mr. Evans in and—or, rather, Mr. Evans came in, I didn't call him in— he just came in himself. I says, 'Mr. Evans,' I says, 'Well, Lige has just told me all about it.' 'Now.' I says, 'Lige, just tell the sheriff how it was.' That is just my language, gentlemen, 'Lige just tell the sheriff how it was.' So he commenced and told the sheriff pretty much the same thing he told me except he didn't tell as much of it as he told me. Then the sheriff spoke to him and says, 'Well, that accounts for the flour being on the gun that we saw down there that day while we were at your father's house.' He said, 'Yes, that is how come the flour on the gun.' His sister handled it. Well, we talked after Evans came in there I expect fifteen minutes. I guess he was 15 minutes telling the sheriff how it happened. I let him do all the talking except once in a while I would just ask him a certain point to have him tell to the sheriff. He told the sheriff, though, all that happened by me telling him to tell the sheriff how it happened. I guess he talked to the

sheriff fifteen minutes, telling how it was.  He talked to me an hour or more.  I believe I was in the jail two hours from the time I went there till I left, because Evans talked to him awhile in the room before I talked to him when I first came down.  Evans and I discussed the matter a little while then. So the next Sunday morning I was up town and the sheriff told me—the sheriff or Busby, I believe it was Evans—that Lige wanted to see me again.  So this man Walker Martin had been killed that night and there was some excitement here and I couldn't go right then, but about 10 or 11 o'clock, I judge it was, I went into the jail again and Lige was brought down again.  He says, 'Mr. Farris,' he says, 'I want to take back what I said last night about my sister having anything to do with it,' he says, 'I want to take all the responsibility on myself.'  I says, 'Lige, well I am inclined to believe what you said last night about your sister hiding the gun was the truth.' He says, 'I want to take that part back.'  He says, 'I killed him myself and I am responsible for it, I don't want my sister brought in it.'  Well, Mr. Evans heard that conversation, I think, I am pretty sure he did.  So that was on Sunday morning.  I didn't see Lige any more until about Monday at noon and I had him brought out to my office.  Mr. Walker, I believe it was, went over after him, and when he came to my office with Mr. Walker I believe I was along, too.  I didn't go up to the jail after him, but I was along.  I heard him tell Mr. Walker, he said he knew Mr. Walker; he says, 'I know you, Mr. Walker,' and shook hands with him, talked with him very intimately, and he told him the principal facts about the killing also at that time.  Then when they got to my office, his mother and his sister were up there and when Lige came into the office and when he got to where they were, why he commenced crying, broke down, and he says that he didn't want anybody punished for it but himself, that he was guilty.

His sister says to him, she says, 'Lige, what did you tell that I had anything to do with it for,' something like that. Lige says, 'Well, I done it myself.' He commenced crying, he asked his sister and mother to pray for him, asked me to pray, for him, asked Mr. Walker to pray for him."

Mr. Mozely: "Did he ask you to pray for him?

"A. He asked everybody to pray for him that was in the room. He broke down and confessed the matter to his sister and mother, without being asked and without anybody suggesting it to him at all, too, gentlemen. I believe that is all I can think of now. I will state, this, though, gentlemen of the jury, I will state this, upon oath, that there were no inducements held out to Mr. Elijah Moore to make this confession in my presence and hearing by me, nor by the sheriff, neither was there any threats made against him to get this confession from him, that I know of, or in my presence."

Farris also states that before Evans, the sheriff, left the room, something was said about the Huff matter, when Evans said: "Just such crimes as this," or, "Just such crimes as these, is what causes mob violence;" and that this was all that was said before defendant about mobs, in his presence. And Farris denies that he talked to defendant about mobs or anything of the kind, to induce him to confess.

On the contrary, defendant testifies as follows:

"Q. Now, after you were arrested on this charge and put in the jail of this county, you made a statement to Mr. Farris, did you not, in which you admitted that you did kill your father? A. Yes, sir.

"Q. Now, if you have any reasons to state to this jury why you made that statement, what caused you to do it, Lige, tell the jury the plain truth about why you did it? A. Mr. Jurymen, the reason that I acknowledged the killing of my father was through scare.

"Q. Just tell the jury what Mr. Farris said to you that would befall you or your family or any person you were interested in if you didn't confess—just what he told you? A. Mr. Farris told me this. When he had me brought down stairs; he commenced talking and he come on down—he was talking—he says, 'Lige' he says, 'I am talking to you to-night for your good.' He says, 'There is a mob on the streets and one in your county, and, by God, I can't save you unless you do what I say;' and he says to me, he says, 'There is stronger circumstantial evidence against you than there was against Jim Henry Tettaton;' and he says, 'Where is he to-day?' He says, 'He sent off and got lawyers, way off,' and he says, 'Where is he at to-day.' He says, 'That is where you will be,' and he says, 'But if you will do what I say, I will save your mother and your sister.'

"Q. Did he tell you in that conversation—first, I will ask you, Lige, where that conversation occurred? A. It was down stairs in the front room, in the jail, in this town.

"Q. Was that the conversation you had with him just before you made this confession to him? A. Yes, sir; just before.

"Q. Now, tell the jury what he said, if anything, that would befall your mother and sister and yourself, if you didn't confess to this crime or didn't tell him about it? A. He says, 'To-night you and your mother and your sister will be hung if you don't acknowledge to this, but if you do I will save you all. I will save your mother and your sister, I will save your blood, too.' That is what Mr. Farris said to me. That is the reason that I made that. I didn't know—he was out; I was in jail. I didn't know what he knew. He was out and I was in jail. I didn't know what to do. I thinks to myself, I would rather save my mother and sister's life and save my own neck and go on to the penitentiary and take it all

rather than to see them die and die myself.   Now, honorable jurymen, that is the facts; that is the facts.

"Q.   Now, as a matter of fact, at the time you made this confession to Mr. Farris, you made it through fear that what he threatened would befall your mother and sister and yourself?   A.   Yes, sir.

"Q.   And made it upon his promise of protection, to save them if you would make it?   A.   That is it, yes, sir.

"Q.   As a matter of fact, at the time you made this confession, you were not guilty of the murder of your father?   A.   I was not; I never done it.

"Q.   You may tell this jury, Mr. Moore, if you were ever, at any other period in your life, arrested or incarcerated in jail charged with any crime?   A.   I never was.   I never saw the jail until I come that night.

"Q.   Were you ever even a witness in court or anything of that character?   A.   I never was.

"Q.   Now, Mr. Moore, you may tell the jury if you remember how long after you were put in jail that you were denied the privilege of seeing any person and especially counsel that you sought to see, if such was the case?   A. Well, I never was permitted to see my folks until after Mr. Farris scared me into this confession.   After that they told me, Mr. Evans and him, or Mr. Evans gave orders that anybody could come up to see me that wanted to.

"Q.   You may state if you made any attempt or sent word or talked to any person through the grated windows of the jail, particularly Mr. Spence, in which you sought to have him come up to the jail to the end that you might employ him as counsel in your case?   A.   I did.

"Q.   If I understand you then you were not permitted to see him until after this confession was extorted, as you have said?   A.   I was not permitted to see him.

"Q. Now, Mr. Moore, I will get you to state to the jury if you ever at any time admitted to any person or confessed to any person outside of Mr. Farris or those who were in Mr. Farris' presence at the time, that you killed your father? A. No, sir.

"Q. Is it not true that to all other persons you have at all times denied being connected in any way with the killing of your father? A. All except one, that was in the presence of Mr. Evans, too.

"Q. Mr. Evans was present at the night this confession was scared from you as you have testified to, was he not? A. No, sir; he was in another room.

"Q. He was there in jail? A. Yes, sir.

"Q. And came back in there and Farris had you recite it to him, did he not? A. Yes, sir.

"Q. Now, I will get you to state whether or not it is true that Mr. Farris stated to you about the time of this alleged confession that if you would confess he would save your blood, as you have stated, and let you go to the penitentiary, and that if you or your folks would put a few hundred dollars in the bank for his use that in a short time he would get you out of the penitentiary? A. He sure done that."

"MR. FARRIS: If the court please, I would like for the stenographer to read the question. [Question read.] I object to that as being incompetent and irrelevant in the form and manner in which it is put—in other words, it must be before the confession and not after."

"THE COURT: No, you testified as a witness, Mr. Farris; It may go to the jury. It goes to your feelings towards the defendant."

"Q. Now, Mr. Moore, there is one other question I wish to ask you: At the time Mr. Evans brought you down stairs in the room of the jail where you had this conversation with Mr.

State v. Moore.

Farris that you have detailed, tell the jury what Mr. Evans said to you, if anything, before he left the room about mob violence? A. He said something about the Huff case, about the man Huff being taken out and mobbed.

"Q. Did he say that to you? A. Well, he spoke it out—I don't know.

"Q. It was in your presence? A. Yes, sir; in my presence.

"Q. Did you know that the morning before you were put in jail some parties had taken a man by the name of Huff out of the jail and hanged him? A. Mr. Farris told it while I was on the stand down home."

The statement of defendant as to the means used by Farris to induce him to confess are fully supported by the testimony of Mrs. John Busby, who, acting as jailer in her husband's absence, testifies what conversation occurred on Saturday night in the jail between Farris and defendant.

She says: "I was first in the kitchen and went to the middle room. I heard Lige crying in there. Then I got up close to the door. There was a crack in the door. I looked through and could see them. I could hear what they said.

"Q. Tell the jury what he said? A. He says, 'Lige,' he says, 'Now, I can't protect you no longer.' He says, 'By God, you have got to do something.'

"Q. Tell what else he said? A. He says, 'This is your last night. You have got to do whatever you are going to do to-night, or,' he says, 'your mother and sister will be hung and you too.' He says, 'There is now a mob in the street and one in your county,' and he says, 'Lige, by God, I can't protect you any longer.'"

The statement by Farris as to the confession made by defendant at his office in the presence of his mother and sister on Monday afternoon is supported by the testimony of Mayes.

Walker, also deputy sheriff, testifies that defendant on Monday afternoon when Walker went down to the jail to take defendant over to Farris's office, had some conversation with him. Here is the conversation as brought out by questions and answers:

"Q. I will get you to tell the jury if you remember of having a conversation with the defendant, Lige Moore, about the killing of his father, in the Bloomfield jail down stairs, on or about Monday after the killing took place on Thursday morning? A. I do.

"Q. Just tell that jury now, Jim, what he said to you?

"Objected to by the defendant, because the foundation has not been laid.

"Q. I will ask you if you held out any inducements to him as an officer, or promised him any reward, or put him in fear, or made threats? A. No.

"Q. Now, tell the jury what you said to him? A. I will tell you what I said to him at the time I went to jail after him and took him to your office to see his mother and sister. When I brought him down stairs I informed him that his mother and sister were under arrest charged with being implicated in the crime. He remarked, 'My Lord, I can't stand that.' He says, 'I am going to clear them and take the whole thing on my own shoulders.' He says, 'They had nothing to do with it and knew nothing of 'it.' He says, 'I done the deed myself.'

"Did he go on and relate the circumstances? A. Yes.

"Q. Tell the jury what he said, all about it? A. He went on and told me he did it and how he did it, how he come to wake up. He said that the baby waked him about 3 o'clock in the morning crying in the other room. He said he had intended to do this two or three weeks before, but he didn't wake up at the right time, or didn't get up his courage, some-

thing of that kind, and he said he got up and put on his clothes and walked out to the gate, looked up and down the road; he said the moon was shining bright—to see if he could see anybody passing. He said he didn't see anybody and he went back and got the gun and went in the room and shot his father."

It is not pretended that on Monday afternoon there was any fear of a mob when defendant confessed to Walker at the jail, nor subsequently at Farris's office, and the fact of making these confessions he does not deny. And on defendant's own theory, all fear of his being mobbed was done away with just as soon as he made the confession to Farris.

Defendant went over in the early morning of sixteenth of November to inform his uncle, Robert Moore, of his father's death. On returning home to his father's house with his uncle, defendant told the latter how his father's gun had been missing about a week; that he didn't know who had it, and that it had been brought back the night before and put in the rack, and that he didn't know who fetched it.

At the inquest, according to Squire Mayes, defendant testified that the gun had been gone about a week or ten days, and that he had asked his father where his gun was, when he replied, "I don't know, I reckon it is about the place somewhere." Defendant also testified that the gun was back in the rack in the morning, that is, the morning after the shooting, and that he found the gun there. This rack was out in the hall.

Farris also testified to examining the gun of the deceased (what defendant said was his father's shotgun) on the morning of the inquest; that the right-hand barrel of that shot-gun had all the appearances of having been fired within six or eight hours; the left-hand barrel was empty, 'as was the right-hand barrel; that he broke the gun, opened it up, and looked

through both barrels toward the window, toward the light; the right-hand barrel seemed to be dirty and nasty and black and smelt like burnt powder; the left-hand barrel seemed to be very dusty, with a whitish dry dust inside of the barrel; that defendant testified at the inquest that he was asleep and didn't know anything about the killing until he woke up the next morning; that he heard no noise or shooting during the night; that defendant was arrested and taken to Bloomfield jail on the day of the inquest, and while on his way there, stated that he knew that he was going to be arrested and charged with the crime of killing his father, when he was called back on the witness stand the second time, although no one in the hack had that night accused him of the crime.    Farris also testified that before they reached Bloomfield, Farris was asked by defendant, if he, defendant, could draw his father's money out of bank.

We are of opinion, after careful consideration of the evidence, that if defendant made confession to Farris, and such extra-judicial confession was made in proper circumstances, it was clearly admissible; but if made under threats, either express or implied, of mob violence in case defendant failed to confess to the crime charged, then such confession is wholly inadmissible.    Whether such confession was made in proper or improper circumstances was a question for the jury under proper instructions on the subject of confessions and when and where admissible.    The admissibility of the confession in the case at bar, was the dominant question before the jury; but on this question no instructions whatever were given to the jury.

An instruction, numbered 6 on the subject of confessions under the term "verbal admissions," was asked by defendant, but refused by the court.    This instruction, though faulty, furnished the basis of an instruction properly drawn; and it

was error to fail to give it.   [State v. Clark, 147 Mo. loc. cit. 38; State v. Reed, 154 Mo. loc. cit. 129, and cas. cit.]

Speaking generally, the instructions given at the instance of the State were such as have frequently received the approval of this court.

And we are of the opinion, also, that there is sufficient evidence in the record to corroborate the extra-judicial confession, conceding it to have been made free from the pressure of improper influences.   And it may .be that the confession made to Walker at the jail on Monday, would be admissible if not made under the influence of a fear previously created and which had not yet lost its force.

For the error mentioned, the judgment should be reversed and the cause remanded.   All concur.