THE STATE v. OTTO MENZ, Appellant.—106 S. W. (2d) 440.

Division Two, June 21, 1937.

*J. Grant Frye* for appellant.

*Roy McKittrick,* Attorney General, *William W. Barnes* and *Olliver W. Nolen,* Assistant Attorneys General, for respondent.

LEEDY, P. J.—Appellant was tried in the Circuit Court of Cape Girardeau County, where he was found guilty of murder in the second degree. By the verdict his punishment was assessed at fifteen years in the State penitentiary. Judgment was entered, and sentence pronounced accordingly, and he appeals.

The case originated in Scott County, where the offense is alleged to have been committed on or about December 7, 1933. The information charged appellant and his wife, Edith, with murder in the first degree in having killed one William F. Roseme by beating him over the head and body with an iron box opener. (One Bob Stroup was also charged with the murder, but by a separate information.) On their application a change of venue was granted, and the venue awarded to the Cape Girardeau Circuit Court. There a severance was ordered, which was followed by the filing of what is referred to in the record as an "application for change of venue herein from Hon. Frank Kelly, the regular judge of this court." This so-called application for a change of venue is not set out in the transcript. It was sustained, and Judge Kelly disqualified himself, and Hon. Robert I. Cope, Judge of the Thirty-third Judicial Circuit, was called in to try the case.

The record is voluminous. The motion for new trial contains seventy separately numbered paragraphs, each assigning error. In appellant's brief these are consolidated and reduced to fifty-seven in number, thirty of which relate to the matter of the admissibility

of appellant's alleged confessions, and procedure with respect thereto. It may be further said that appellant's statement covers forty-seven pages, his points and authorities twenty-five pages, and argument two and one-half pages. Appellant insists that under .the evidence, and aside from alleged errors presently to be noticed, he is entitled to an outright reversal and discharge.

The facts: William F: Roseme, the deceased, operated the one store at Rockview, a village in Scott County, which had a population of about one hundred. He was an elderly man, about seventy years of age and lived alone in the store. Rockview is about two miles north of Chaffee, where the tracks of the Frisco and Cotton Belt railroads intersect. The tracks of the Cotton Belt extend east and west through the village. Roseme's store; located about sixty feet north of the tracks, faced south and abutted on the east and west road lying between the store and the tracks. A short distance to the east of the store was the residence of Mike and Agnes Demey. There was a driveway and a store pump between the Demey premises and the store. The store was bounded on the west by a gravel road running north and south, which was the main traveled road from Chaffee to Ancel, Forfelt and Illmo, on which road appellant resided—a distance of a mile and a half northeast of Rockview. Arnelia Demey lived on that road in the first house north of the store. The store had a double front door, closed at the center, and equipped with a night lock. On the inside, there were brackets to hold a bar going across the double doors. There were two windows on the front of the store—one on each side of the door. There were windows on the east side—one in the middle of the building and another toward the front. There were counters on each side, the one on the east extended north from the front about ten feet. About "middle ways" of the store building on the east side there was a cased opening, five or six feet wide, and the height of an ordinary door, which led off of the main store into a "lean-to" consisting of two rooms. The two rooms were divided by a partition running east and west, it being located just south of the cased opening. In the north room of the lean-to there was a table or bench with bacon on it and "a lot of tools and stuff." The front or south part of the lean-to was used as a kitchen, and was equipped with a cook stove, a small cabinet and a table. North of the main storeroom on the first floor were two rooms, one a living room and the other a bedroom. There were three rooms upstairs. The stairway was in the downstairs living room. There were two bedrooms and a storeroom upstairs. The deceased occupied the middle room upstairs.

Contrary to custom, Roseme's car was not placed in the garage on the night of December 7. On the morning of the 8th, it was still in front of the store with the keys in the ignition. The store did not open and officers who were called, forced an entrance, and

found the dead body of Roseme. It was partially in the side room or lean-to, and partially in the main part of the store. "His knees were laying about even with this opening and the rest of his body was in the main part—the upper part of the body in the main building." The body was stretched out with the right arm under him. The face was clotted with blood. There was a pool of blood eighteen or twenty inches in diameter around his head with two streams running off some three or four feet to the left of the body. The body was fully clothed. There was a cap lying near the head, and a pair of glasses near the feet. No money was found on the body. The money drawer, an old-fashioned affair with keys underneath, and a sliding tray, was on the west side of the store. It had been prized open. In it there was found a dime, some keys and valve caps. The tray was missing. There were cans of groceries on the shelves above. The money drawer and two or three cans had been knocked off onto the floor. There was a billfold, with the name of deceased on it, and two money sacks back of the cans. There was no money in the billfold or money sacks. There was an iron box opener on the shelf above the money drawer. The marks on the money drawer, where it had been forced open, were compared with the box opener and the prongs on the latter were found to fit. In the north room of the lean-to there was a piece of bacon, about three or four pounds in weight, which had been cut off, and it was on the floor at Roseme's feet. There was an ax, the handle of which "was laying right across the meat, like it fell across it." In the kitchen or south room of the lean-to, "there was a plate and a couple of knives and forks" on the table. There had been a fire in the cook stove. "Three or four pieces of kindling had been laid on top, and smothered out." When the officers forced their way in, the bar customarily placed across the front doors on the inside was not in place, but was nearby. The door was locked by an automatic night lock. The lamps had been turned out, rather than blown out. There was medical evidence to the effect that death was due to three fractures of the skull (any one of which was sufficient to have produced death), several scalp wounds on the back of the head, and loss of blood and exhaustion. The coroner was of the opinion that Roseme had been dead about three hours when the body was discovered.

As stated, appellant lived a mile and a half north and east of Rockview. His wife, Edith, had worked for deceased. As one witness stated it: "She cleaned up for him pretty often. Sometimes she was there two or three times a week and sometimes it would be a couple of weeks before she would be there." Bud Demey, who lived half a quarter of a mile west of appellant, and between appellant's home and the store, testified that early on the morning Roseme's body was found, he saw appellant walking west along the road toward Rockview. "It was just good daylight. When I first noticed him

he was walking fast. Then he slowed down and stopped. . . . I was pretty far off, but as near as I could tell he was acting like he was rolling a cigarette and looking down the road. . . . Then he started out fast again and slowed down and stopped again." This was repeated three times.

Agnes Demey, who lived next door to the store on the east, testified that at about seven o'clock on the morning of December 8, she noticed appellant on the front porch of the store; that "he went and blowed the car horn, went to the pump and got a drink, and I saw him looking in two kitchen windows." It appears the body of Roseme could not have been seen by looking in those windows, but might have been seen from the middle window on the same side of the store, which was five feet north of the front windows referred to by the witness. If appellant looked in the middle window, the witness did not observe it. "He walked up to the pump, got a drink a couple of times, walked backwards and forwards in front of the store . . . he kicked on the side of the house and hollered for Mr. Roseme." The witness further testified that later in the morning, "when they were taking Mr. Roseme's body out, I was there on the porch and he (appellant) said he wished he hadn't come over there that morning; I asked him why; he said: 'It looks kind of bad for me.' I told him someone had to be first to find him, and he said he wished it wasn't him. Q. Had you or anyone else accused him of having anything to do with Mr. Roseme's death, as far as you know? A. No, sir." On cross-examination it was developed that the witness was not at home the night before until after eight o'clock, and upon her return and thereafter there were no lights in the store, nor did she hear any noises there—scuffling, licks or anything of that kind.

By the witness John Griffin, a section hand, it was shown that appellant was at the store about eight o'clock when the section crew went to work. Griffin and Clyde Hanna, another section hand, were at the store pump. Appellant was on the porch and "he come to the pump where we was pumping the keg of water. He said to Clyde, 'Mr. Roseme must be bad sick or dead.' He (appellant) said if he was dead he would set 'em up to a quart of whiskey." Griffin was corroborated by Clyde Hanna, who was called on behalf of the appellant. Appellant did not deny making this statement.

When the sheriff reached the scene of the homicide on the morning of the 8th, he found his deputy in charge. The appellant was present and conversed with the sheriff. Among other things he said he and his wife and his father and mother had been at home the night before and did not leave the house "from dark on. He said that he went to bed a little after dark and he didn't leave the house and nobody left and nobody came." The sheriff testified that when

directed to assist in moving the body of deceased, appellant was "very nervous, didn't seem like he liked to do it but he did. . . . He was backward about taking hold and kind of gave me a dirty look about it." A few days after the homicide appellant was taken into custody by the sheriff, ostensibly for his failure to pay the outstanding costs in a previously dismissed criminal case. Although nothing had been said about the Roseme matter, appellant there stated to the sheriff, "Joe, by G—, I didn't kill old man Roseme." En route to the county seat he again told the sheriff who was accompanied by a justice of the peace, that he (appellant) and his wife were at home all night and that nobody else was at their house. There was evidence to the effect that Roseme usually closed his store early—"between sundown and dark." On the evening of December 7, a C. & E. I. train went through at six-five P. M. and the conductor noticed the store was dark at that time.

The witness Tom-Scott, called on the part of the State, was an ex-sheriff of Scott County, and well acquainted with appellant. In December, 1933, he was deputy warden of the State penitentiary, and was in Benton on a visit. He saw appellant while the latter was confined in what was called the "juvenile" jail on the second floor of the courthouse. Scott was passing along the street, and appellant called to him from the jail and asked that he come up to see him, which he did. The ensuing conversation, as related by Scott, was as follows: "He told me this man Stroup came down to his house that afternoon in a truck and they had taken some wood cutters home, I believe two, and went from there over to Rockview; that there was some woman over at Rockview that Stroup wanted a date with; I don't remember the woman's name, and I am not positive whether he said he was to make the date or his wife, but some woman there Stroup should have wanted a date with, and they drove over there and drove just north of the Roseme store, and they stopped and his wife got out and went in the store. Q. Whose wife? A. Ott's wife, and that he stayed in the truck, he never got out of the truck, he told me, and that his wife and Stroup went into the store, and a short time later his wife came out and got into the truck and then a short time after that Stroup came out—he said he came out hurriedly, and when he got to the truck he said, 'Well, I got his money, but I had to knock him in the head.' "

It was developed that later that same day appellant requested Tony Drexler, courthouse engineer, to see if Mr. Scott had left town, saying, "I want to talk to Tom, I want to tell him everything." Being informed Scott had left town, appellant had the following conversation with Drexler: "He said his wife got him into this; I asked him how, and he kept talking how she got him into it and said they drove a truck there and Stroup and his wife had gotten out of it but he didn't say where they went or how long they were gone; but

he said he set in the truck, and then went off talking about something else.''

While in custody at the county seat, appellant made two written statements concerning the homicide, one dated December 15 (Exhibit 1), and the other dated December 17 (Exhibit 4). The facts respecting the making of these statements will be stated later in the opinion in connection with the points relating to their admissibility. The statements are in words and figures, respectively, as follows:

(Exhibit 1.)

"Benton, Missouri, December 15, 1933.
"Statement made in sheriff's office by me of my own free will regarding what took place at the store of Mr. Frank Roseme in Rockview, Missouri, on the night of December 7th, 1933.

"About sun-down on the evening of December 7th, 1933, Bob Stroup came to my house alone, driving a Chevrolet truck. After a short stay at my house, I asked Bob Stroup if he would take Silestine Ledear and Tony Hess home, and Stroup said he didn't have time to take them all the way; I said let's take them as far as Tony Hess' place, and he finally agreed to do this, and my wife Edith, myself, Tony Hess, Silestine Ledear got in the truck with Bob Stroup.

"I noticed at the time Bob Stroup was in no condition to drive the truck and I drove truck for him. We drove the truck to Hess' place and let Tony Hess and Silestine Ledear off the truck.

"We then turned the truck around in the road and drove to Rockview and stopped the truck on the west side of the store, stopped the truck about middle ways of the store. I believe I left the motor running, leaving the lights of the truck on. This was about 7 P. M. Bob Stroup got out of the car and said to me quote: Wait here. I am going to knock the old man over—my wife then got out of the truck and she and Bob Stroup left together—all of this time I remained in the car and they walked toward the front of the store. About five minutes afterwards my wife came up to the truck and climbed in the seat and in a few minutes later Bob Stroup came to the truck and climbed in and said drive off. I immediately drove out the road toward my home. A short distance down the road Stroup said, quote: I had to knock him down to get the money.

"I want to make a slight correction as to the location of the truck —when we stopped at Rockview instead of stopping by the side of the store on the west side of the store, I stopped for a brief moment and Stroup got out of truck—to the best of my knowledge my wife and I drove down the road and stopped where Bob Stroup had told me to stop—this was about 40 feet past Rosalie Demey's house. I then stopped the truck and shut off the motor, and believe I turned

off the lights—Stroup had instructed my wife to call Arnedia Demey and she got out of the truck and called, but I don't know whether she received any answer—my wife told me she wanted to get a sack of tobacco, and walked towards the store. I remained in the car about ten minutes and then my wife approached the car and climbed up beside me in the car but had no tobacco. About five minutes later Bob Stroup came to the car, climbed in, and said, drive off. I immediately drove north toward my home and a short distance down the road Bob Stroup said, quote: I had to knock him down to get his money. Stroup stated further that he didn't know how many times he had struck the old man, but was afraid he may have killed him. I was so excited over the whole thing that I drove on down toward my home without saying a thing. My wife and Stroup, however, carried on a conversation, but in my endeavor to get home as quickly as possible, I paid no attention to what they were saying. I stopped the truck at the same bridge a short distance in front of my house and my wife and I walked the balance of the way home.

"Stroup started the motor and drove off. I never saw any money —I don't know whether or not my wife received any of the money. I believe we arrived home about 7:30 P. M. I felt uneasy as to just what damage Stroup had done Mr. Roseme after he had struck him, and early the following morning I went to the store and tried to open the door, but found it locked.

"Before leaving the next morning I said to my wife, quote: I had better go down to the store and see if Stroup killed Mr. Roseme. She replied. It would be too bad if he had killed the poor old soul.

"At various times since this happened my wife and I talked about the murder and on December 13th I was arrested. The morning after the murder I saw Bob Stroup at the store in the crowd. He came in the store and looked at the body and then turned and hurriedly left and drove off in his truck and I have never seen him since.

"I wish to add that on December 7, 1933, on the night after he had struck Mr. Roseme that as we were driving toward my home Stroup said to me, quote: I'm going home and will see you later and return the favor.

"The above statements were made by me in the presence of the witnesses signing and were made of my own free will without any threats or promises of clemency.

"(Signed) OTTO MENZ."

The other statement (Exhibit 4) is dated December 17, 1933, and is as follows:

"Bob Stroup, Edith Menz (my wife) and myself drove down to Mr. Roseme's store, Stroup driving, about 5:30 or 6 o'clock. Stroup,

my wife, and myself entered store, Stroup ask for three pounds bacon, Mr. Roseme went into side room for bacon, Bob Stroup struck him four times on the right side of the head, Mr. Roseme fell forward, moaning as he fell, Mr. Roseme tried to raise head and fell, forward again, the instrument used was a heavy iron box opener. I was standing near the stove in the Big store room. The bacon fell in back of Mr. Roseme.

"My wife Edith Menz was behind counter on east side of stove. I stood and looked at him about ten minutes. My wife (Edith) screamed 'Oh Lord' and ran out the door. Bob Stroup went back of counter to the cash drawer and grabbed for money, some cans fell on floor. When Bob Stroup reached behind them for pocket book or something looked like black purse, about size of large envelope. Stroup ran out of doors leaving me in store and I came out behind him pulling the door shut.

"We then got in truck and drove back to our home, my wife and I going in and Stroup driving away after saying I will see you later and return the favor.

"The above statements were made without any threats or offers of clemency in any manner.

"(Signed) OTTO MENZ."

Appellant, hereinafter sometimes referred to as "Ott," was about thirty-six years of age, and, as stated, lived on a farm about a mile and a half northeast of the Roseme store. His father and mother (Mr. and Mrs. Sam Menz, Sr.) lived in the same house, but it appears that separate households were maintained. Stroup was married and lived with his wife and family at Cape Girardeau. Appellant stoutly denied his guilt. He took the stand and testified at length, as did Edith and Stroup. His defense was in the nature of an alibi, in support of which he offered testimony to the following effect: That on December 7, he spent the day "dragging logs" near his home, and was assisted in that work by his wife, his father and Celestine Ledure and Tony Hess. Quitting work about dark, he and his wife returned a borrowed team and wagon to the owner, Fred Lux, who lived a mile and a half away; that they stayed at the Lux home twenty or thirty minutes, and were returned to their home by Bill Brock in the Lux car, and made no stops en route; that Ledure and Hess were drunk when they left to go to the Lux place, and on their return Ledure was asleep, and had "passed out," but Hess, who had gotten very drunk and quit work at three or four o'clock, had sobered up some, and could "walk around." Ledure and Hess seem to have been in the part of the house occupied by Ott's father and mother. At any rate, after supper Edith was in readiness to retire for the night, and had put on her pajamas. She was reading the evening paper to Ott, when Bob Stroup arrived in his new Chevrolet dump truck. Stroup admitted he was drinking some, and had no

particular reason for the trip. Thereafter it was arranged that Stroup, Edith and Ott would take the two drunks to the home of Hess, using the Stroup truck for that purpose. In the meantime Julius Mills and Clyde Hanna stopped by, and purchased some liquor from Ott. Elda Menz and Celestine Hawn were also at the Menz home that evening. Leaving the Menz place "about 8:30" in the Stroup dump truck, Ott, Edith and Stroup rode in the cab, and carried Ledure and Hess in the dump bed. They deposited the two drunks at the Hess place, then proceeded west to Rockview. The three of them testified they stopped the truck in front of the first residence north of the Roseme store, where Arnelia Demey lived, and that the sole purpose of going by Rockview was that Stroup wanted a date with Arnelia and so to have her join them in going to Chaffee to have some "eats and beer." They honked the horn several times. The house was dark and no one came out. The motor was kept running and the car lights were left on. After waiting three or four minutes, they drove on north and east, and on reaching the Menz place Ott and his wife got out and went into their home, and Stroup went on to Cape Girardeau, where he lived. It was then "about nine o'clock." Appellant and his wife then retired for the night. The mother of Arnelia Demey testified that shortly before 9 o'clock on the night in question she was awakened by persons talking in front of her home; that they were in a car or truck, which was headed north; that they remained there about 5 minutes after she awakened, and then drove on north.

Ott testified that the next morning he began "stirring around" about seven o'clock; that he walked to Rockview before breakfast leaving home "about twenty minutes to eight;" that his purpose in going was "to see Tucker and to get some tobacco and some bread;" that he passed Bud Demey's place about "a quarter of eight," and was smoking a cigarette, traveling "just in an ordinary walk like I always do;" that as he passed the home of Leonard Tucker, a section hand, who lived west of Bud Demey's and within less than half a mile from the Roseme store, "Tucker slammed the door, and I saw who it was and stopped and we come on together." The section men went to work at eight o'clock. Appellant was corroborated as to the hour and the fact of walking with Tucker to Rockview by the latter. On cross-examination of appellant it was developed that he wanted to see Tucker "because he owed me a dollar. Q. For a pint of whiskey? A. No, a quart. Q. Did you get the money from him? A. No." When they got to Rockview Tucker went across the tracks to the tool house, and Ott went up on the store porch. No one else was there at that time; the store was not open, and the car was out in front with the keys in the ignition. Appellant testified he honked the horn on the car, and rattled the front door of the store "once or twice," but got no response. He was there alone about thirty minutes

until Mr. Sayer arrived. He held a ladder for Sayer to climb up on top of the lean-to on the east side, and look in the upstairs bedroom window "to see whether he could see Mr. Roseme in bed." When asked what he did then with reference to finding out why the store wasn't open, he said he next walked around in front of the store, and on the *west* side, and Sayer went north along the *east* side of the store, and presently he heard Sayer say, "There he lays." But even then appellant did not look in the east window from which the body could be seen, nor did he see it until after the door was forced open by the officers, and others went in the store, and then he did not remain.

There was some testimony respecting a stranger who was seen in the Roseme store in the late afternoon or early evening of December 7. It was sought to be shown that his description tallied with that of a tramp who was arrested that night in Chaffee who had some old coins or money on his person. It was also shown that a pocketbook with deceased's name on it was found some months later along the railroad between Rockview and Chaffee, and near the same place was found what appeared to be the sliding drawer of a money till.

There were many conflicts and inconsistencies in the evidence offered on the part of appellant, and the inferences to be drawn therefrom were not at all favorable. They need not be noticed in detail, but merely by way of example, the following may be cited: It appeared that on the night in question, after leaving Arnelia Demey's house Stroup was driving fast, and that in negotiating a curve en route to the Menz place, the car skidded and Edith Menz screamed, and she and Ott made some complaint about the driving. Stroup testified that he thought Ott and Edith got out of the car at that time, and, as accounting for his presence at the scene of the homicide on the morning of December 8th, said that he drove by to apologize to Ott and Edith for his reckless driving, and making it necessary for them to get out of the truck before reaching their destination; that notwithstanding such was the purpose of the trip, and the fact he saw both Ott and Edith at the Roseme store shortly after the body was found, he made no apology, and did not learn until later that they had actually ridden to their home with him.

Stroup was arrested at Piggott, Arkansas, on the night of Friday, December 15. He had withdrawn his truck from work at the cement plant the evening of December 7, without any cause therefor, as he testified, and left early the next morning for Piggott, going by the Menz place and Rockview, for the purpose above mentioned, although it was considerably out of his way to take that route.

I. Before giving consideration to the merits of the case, we first examine certain preliminary questions raised by appellant:

(A) Originally there were three cases filed in the Circuit

Court of Scott County involving the homicide in question, each charging murder in the first degree. They were filed simultaneously, on March 10, 1934. In case No. 2496, Otto and Edith Menz and Stroup were jointly charged. In case No. 2497 Bob Stroup was separately charged, and in case No. 2498 (the instant case) Otto and Edith Menz were jointly charged. Appellant moved to quash the information, and was overruled. It is his contention that two indictments against the same individual, filed simultaneously, charging the same offense are mutually destructive, and for that reason, it was error to overrule his motion to quash. None of the cases relied on are in point. All of them deal with the effect of the filing of a second information charging the same offense, and hold that, by force of the statute (Sec. 3550, R. S. 1929, Sec. 3550, Mo. Stat. Ann., p. 3150), the first information is suspended. Besides it appears that motions to quash were filed in all the cases, and all the motions were taken up and heard together. The court was justified in treating the information bearing the largest serial number as a second information, under the provisions of the statute, supra, and to proceed accordingly.

█ (B) It is contended that Judge Cope was without jurisdiction to preside at the trial for this reason: That in making the order disqualifying himself, and calling another judge, Hon. Frank Kelly, the regular judge of the court, did not, at the time the remainder of the order was made, designate or write into the order the name of the judge being called in—that is, it was made in piecemeal, and the name of Judge Cope was afterwards inserted in the blank left for that purpose. On the hearing on the plea to the jurisdiction it was shown that the judge dictated a minute to the effect that he was disqualifying himself and calling in another judge; that later in the day the judge gave Judge Cope's name to the clerk, who then wrote out the order and spread it of record. In view of this showing, made by appellant we are unable to appreciate the force of his contention.

█ II. On cross-examination the witness Stroup (called on behalf of appellant) admitted that when first arrested he stated to the officers that on the night in question, when he and Edith and Ott were down near the Roseme store in the truck, that he (Stroup) stayed in the truck and Ott and Edith got out and went down to the store. He admitted having so testified on the separate trial of Edith, at which time he also said that Ott said he was going to get tobacco, and they were gone about five minutes. It is urged that it was improper to permit the State to examine the witness in the respect mentioned, because hearsay. It was admitted for the purpose of impeachment, the witness having testified on direct examination

that none of them got out of the truck when stopped near the store. The ruling of the court was proper.

■ The court refused to permit appellant's counsel to cross-examine the witness Hobbs with respect to certain phases of his testimony given on the trial of Edith Menz. This was based on the proposition that it is not permissible to impeach a witness on an immaterial matter. It is unnecessary to set out the specific subject-matter of the inquiries, but upon an examination of the record, we are of the opinion that the court, in the exercise of a sound discretion, properly ruled the questions.

■ On cross-examination, the sheriff was asked if he had not made application in writing to the Veterans' Bureau to the effect that he was "suffering from a mental and nervous disease called neuro-sciatic ailment, and was rated by the Veterans' Bureau as sixty-six per cent mentally and nervously incapacitated." The State objected, and appellant's counsel stated: "We will follow this up with medical testimony as to the effect of that on his ability to narrate things from memory, as affecting his credibility as a witness." The ruling of the court was: "If you can prove this man is insane or mentally weak, I might let you do it." The incident was closed by the noting of an exception. The most that can be said of the ruling is that the court seemed to entertain some doubt about the matter, but offered, qualifiedly, to permit a showing touching the mental condition of the witness. The matter not having been pursued further, we think appellant is in no position to complain.

■ In connection with the cross-examination of the sheriff, appellant's counsel sought to elicit that the witness, on a specified date, had been *arrested* in Detroit on a charge of larceny. This the court refused to permit, and rebuked counsel for asking the question, stating that the inquiry would be limited as whether he had been convicted. This was proper. The fact that a witness has been convicted of a crime may be shown as affecting his credibility as a witness, but the fact that he is then, or has been in the past charged with the commission of a crime, with no showing that the charge had been followed with a conviction, is not admissible. [State v. Pine, 332 Mo. 314, 57 S. W. (2d) 1087; State v. Wigger, 196 Mo. 90, 98, 93 S. W. 390; State v. Hillebrand, 285 Mo. 290, 225 S. W. 1006; State v. Snow (Mo.), 252 S. W. 629, 631.]

■ III. Appellant challenges the sufficiency of the evidence is based on the proposition that his statements, both oral and written made while in custody, should have been excluded. This point is ruled adversely to him in another paragraph. He does not contend that the conviction is not supported by substantial evidence, if his statements are competent. Indeed, he could not sustain such a contention, if made, in the light of the facts as hereinabove detailed.

The State having made a case for the jury, his demurrer was properly overruled.

■ IV. Complaint is made that instructions No. 2 and No. 3 "declared abstractly that all persons acting together with a common intent are equally guilty of a crime and that all persons who counsel and incite others to commit a crime are equally guilty." It is also contended that there was no evidence to authorize the submission of such a theory. "'A conspiracy, like any other fact, may be shown by circumstantial evidence; it is not necessary to prove by direct evidence an agreement to commit a crime in order to establish a conspiracy. [State v. Fields, 234 Mo. l. c. 623; State v. Shout, 263 Mo. l. c. 363; State v. Lewis, 273 Mo. 531; State v. Walker, 98 Mo. l. c. 104.] Because of the difficulty in procuring direct evidence, generally it must be shown by circumstances.' [State v. Delbono, 306 Mo. 562, 268 S. W. 60.]

"'A conspiracy may be proven by circumstances. It is not necessary to prove that parties who engage in a common enterprise to commit a crime made a definite agreement before committing the crime.' [State v. Stamper, 314 Mo. 645, 285 S. W. 437, and cases cited; State v. Kinnamon, 314 Mo. 662, 285 S. W. 62.]" [State v. Buckley, 318 Mo. 17, 298 S. W. 777.]

The form of the instructions has had the approval of this court in numerous cases. [State v. Valle, 164 Mo. 539, 65 S. W. 232; State v. Hardin, 324 Mo. 28, 21 S. W. (2d) 758.] There was sufficient evidence to authorize the jury to find there was a conspiracy, so it was proper to submit that issue. This ruling necessarily disposes of the objections made to the giving of Instruction No. 5, and the refusal of Instruction E-D withdrawing that issue.

■ V. We turn now to a consideration of what is characterized by appellant as the "real battle ground in the case"—i. e., the admissibility of the statements made by appellant while in custody, and the procedure by which the same came in. Twenty-eight points are attempted to be made under these heads. Most of the so-called points are mere abstract propositions of law, and their applicability under the facts in the case at bar is not made to appear.

By the testimony of the sheriff, offered on the part of the State, it was shown that appellant was taken into custody on the afternoon of Wednesday, December 13. He was taken to Benton, the county seat, where he had the freedom of the yard some hours before being locked up. That night he was taken to the sheriff's office and questioned for about twenty minutes. Denying any part in the crime, he was returned to his cell, where he remained all night undisturbed. His sister, Clara, visited with him the next morning. He remained in jail Thursday and Thursday night without being questioned. The sheriff testified he may have talked to him "a little through the bars

on Friday." About seven o'clock Friday night he was again taken to the sheriff's office, where he was questioned in the presence of four or five officers. He was there "until close to midnight." During that time he was not abused or threatened in any manner, no promises of any sort were made to him and he made a written statement, Exhibit 1. At this juncture, an objection was interposed, the ground being that the statement was not voluntary, and appellant's counsel announced: "We are prepared to make a showing to that effect." The jury was then excused and the sheriff was examined by appellant's counsel as to the facts surrounding the making of the two written statements, Exhibits 1 and 4. There was nothing developed thereby tending to show said statements were anything but voluntary. Appellant's counsel then sought to offer Edith Menz on the question of the involuntary nature of the statements. This the court declined to permit, but called the jury back, and proceeded to hear the testimony of the sheriff, and at the conclusion thereof, admitted the exhibits in evidence. In so doing, the court fell into error. The rule is well settled that a confession is presumed to be voluntary until the contrary is shown (State v. Roland, 336 Mo. 563, 79 S. W. (2d) 1050, 102 A. L. R. 601; State v. White, 330 Mo. 737, 51 S. W. (2d) 109; State v. Patterson, 73 Mo. 695; State v. Meyers, 99 Mo. 107, 12 S. W. 516; State v. Jones, 171 Mo. 401, 71 S. W. 680, 94 Am. St. Rep. 786; State v. Woodward, 182 Mo. 391, 81 S. W. 857, 103 Am. St. Rep. 646; State v. Armstrong, 203 Mo. 554, 102 S. W. 503; State v. Meyer, 293 Mo. 108, 238 S. W. 457; State v. Reich, 293 Mo. 415, 239 S. W. 835; State v. Hayes (Mo.), 247 S. W. 165; State v. Hershon, 329 Mo. 469, 45 S. W. (2d) 60), but when a timely request is made for a preliminary investigation as to its voluntary or involuntary nature, or where, as here, there is an offer to show it was made under such circumstances as to render it inadmissible, it becomes the duty of the judge to hear and consider all competent evidence offered on the question as a basis for determining, in the first instance, whether it shall go before the jury. [State v. Kinder, 96 Mo. 548; State v. Stebbins, 188 Mo. 387, 87 S. W. 460; State v. Nagle, 326 Mo. 661, 32 S. W. (2d) 596.] If rejected, of course, the matter is at an end; but if, in consequence of the determination of this preliminary question, it is admitted in evidence, the question of its voluntariness is ultimately one for the jury, under proper instructions. [State v. Moore, 160 Mo. 443, 61 S. W. 199; State v. Brooks, 220 Mo. 74, 119 S. W. 353; State v. Thomas, 250 Mo. 189, 157 S. W. 330; State v. Batterson (Mo.), 274 S. W. 43; State v. Lowry, 321 Mo. 870, 12 S. W. (2d) 469; State v. Hershon, supra. See, also, 85 A. L. R., pp. 901-904.]

It further appeared that Saturday afternoon the sheriff, in response to a request from appellant, went to the latter's cell when and where the appellant told the sheriff if he would "take him some-

where out near his home he would show me where the money was hid that they had robbed old man Roseme of." He was taken to the place he designated, which was within a quarter of a mile of his home "where he went to scratching around and never did find anything; we looked for money." He said his wife had hidden the money. While there appellant talked with his father, apparently in private. He requested permission to go to the house to talk with his mother, but when told he would have to be accompanied by an officer, he declined the offer. He was returned to jail and later that night, "after supper," he was again taken to the sheriff's office, where he made the second signed statement, Exhibit 4, "around two o'clock." In the interval between the making of the two statements, Stroup had been arrested. Edith Menz was also in custody and she was brought over to the sheriff's office for a short time Friday night, but appellant was not permitted to communicate with her alone. Between the time he was arrested and the time the written statements were made, he was permitted to talk with relatives and others from time to time. "People came up and talked (to appellant) all the time. He didn't ask to talk to anybody . . . he talked to everybody he wanted to and hollered at them out of the window." During the questioning by the officers, he was permitted to smoke and to have coffee. It appears that the statement made Saturday night, Exhibit 4, was prepared in the presence of appellant and his wife. When it was being written, if there was any difference between them as to the facts being stated, they would discuss the matter and both accede to the draft.

It further appears that on Saturday night, Ott and some of the officers were in one room and the sheriff was in the next room, when the latter heard appellant "holler, 'Joe, Joe.'" The sheriff went immediately into the room. "It was dark and about the time I got there somebody flashed a flashlight and somebody pressed the button on and Ott was going for the door and somebody grabbed hold of him." The light was then snapped on. "When the light went off, it scared him and he was nervous and he hollered 'Joe, Joe,' and I got there as quickly as I could." It was denied that the lights were purposely turned off or that appellant was struck or mistreated during the momentary period of darkness. That appellant was nervous from the time of his arrest does not seem to be in dispute.

In sharp contrast to the testimony offered by the State, appellant testified to the effect that he had no knowledge of having signed any written statements but at the times in question he was threatened, cursed, kicked, beaten, given whiskey, gin, and narcotics (the latter in cigarettes furnished to him), promised clemency and immunity, offered money, cajoled and begged, subjected to continuous questioning over a long period of hours by officers in relays, and not per-

mitted to communicate with relatives and friends, and otherwise coerced and intimidated. All of which was denied by witnesses on the part of the State, who were present on the occasions referred to. His recollection was exceedingly clear as to the many acts complained of and alleged indignities suffered by him, but entirely blank as to the fact of having signed any statements. His wife and Stroup corroborated in part his version of the treatment accorded him. It would serve no useful purpose to set out the evidence on this issue in greater detail. One of the cases most strongly relied on by appellant is that of State v. Thomas, supra, which, while condemning the procedure here followed, expressly holds the error of the court in failing to hear the defendant on the question of the voluntary nature of the statement as a preliminary question did not require a reversal, because harmless, in view of the fact that the matter was fully developed and gotten to the jury in the course of the trial. We so hold in this case. We have examined the many complaints made with respect to the submission of the issue of voluntariness by Instruction No. 4, given on the part of the State, as well as the refusal of instructions requested by appellant, and we are of the opinion that the record does not show reversible error therein.

There is nothing in the proposition that the failure to release a person upon the expiration of twenty hours, under Section 3952, Revised Statutes 1929 (Sec. 3952, Mo. Stat. Ann., p. 2764), a charge not having been filed, constitutes, as a matter of law, such duress as to render any statement or confession made thereafter to an officer presumptively involuntary. The case of State v. Condit, 307 Mo. 393, 270 S. W. 286, relied on by appellant, is no authority in this cause because the facts in the two cases are wholly dissimilar.

We think appellant had the full benefit of his claim that his confessions were not voluntary where the court instructed that before any confessions or admissions could be received or considered as evidence against the defendant, it must have been shown that they were voluntarily made, and that such confessions or admissions should be wholly disregarded if obtained while he was in custody "if they were brought about and made by inducements held out to the defendant, or promises which operated upon the mind of the defendant in the hope of escaping punishment or obtaining leniency or any inducement amounting to threats, fears or promises."

VI. In rebuttal, three character witnesses were called who testified, over objection of appellant, that his general reputation for morality was bad. Assuming the objection interposed was sufficiently specific (which is denied by the State), it was undoubtedly error to admit such testimony. [State v. Williams, 337 Mo. 884, 87 S. W. (2d) 175.] However, we are constrained to hold the error not

reversible in the light of the showing made by appellant. As a part of his alibi, he established that on the very night in question he was engaged in a violation of law, namely, the unlawful sale of intoxicating liquor. Indeed it appears from other evidence developed by appellant that his business was that of a "bootlegger." As much is tacitly admitted in this court, for in his brief it is said (referring to appellant, his wife and Stroup): "It is inescapable that these three people, ignorant and unprincipled bootleggers, as perhaps they were. . . ." We are satisfied that in view of his own showing the error was harmless.

VII. We have examined the assignments complaining of the remarks and conduct of the judge throughout the trial. We find nothing therein sufficient to warrant a reversal. The appellant appears to have had a fair and impartial trial. His conviction is based on substantial evidence. Under the record before us, it should be, and it is, affirmed. All concur.