STATE v. FRED ELLIS, Appellant.—No. 39330.—193 S. W. (2d) 31, 37.

Court en Banc, February 11, 1946.

Rehearing Denied, March 11, 1946.

*R. H. Schaper* and *Frank W. Jenny* for appellant.

*J. E. Taylor*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

1000

DOUGLAS, J.—Fred Ellis, appellant, was found to be one of the murderers of Mary Santo and was sentenced to death.

Mary Santo, fifty-six years old, lived in a lonely section in hilly and wooded country two miles northwest of Pacific in Franklin County. Her closest neighbor was about a quarter of a mile away, the house almost obscured from view by the hills. About 9:30 on Sunday morning, December 12, 1943 a caller at Mrs. Santo's home noticed the kitchen door open and smoke coming out. Upon entering he noticed the stove was overturned, the room in confusion and blood on the floor. He heard a groan, went farther and saw a body on the floor in the adjoining room. Without investigating further, he quickly went to Pacific for help. He returned with two companions who dragged the body out onto the porch and recognized it as Mary Santo. There she died. Her head and face had been crushed and mangled, one eyeball was gone, the other dangling, her nose knocked to one side and the bones of her face broken and forced through her skull. Her clothes were burned from her body. A pair of knucks was on the kitchen floor. Empty bottles, some of which had been broken, were on the floor by the body. Later when examined blood and hair were found on some of the bottles. There was blood on the floor and spattered on the walls of the kitchen and on the dining room floor. Dresser drawers were open and the contents blood stained. The coroner and the sheriff of Franklin County and the State Highway

Patrol were notified. Members of the patrol were the first officers to respond.

About noon on Tuesday, December 14, Ellis was arrested in Pacific by the City Marshal who turned him over to the Highway Patrol. He was taken by the patrolmen to the headquarters of Troop C of the patrol in Kirkwood, St. Louis County, where he arrived between 1 and 2 o'clock in the afternoon. No warrant had then been issued for his arrest nor does it appear that he was then formally arrested. The time when a warrant was subsequently issued is not shown. The evidence does not disclose all of Ellis' movements precisely and in detail between the time he was brought to headquarters and Friday evening when his confession was obtained there. He was questioned when he was first brought in. Then members of his family, who were also brought to headquarters, were questioned for the purpose of checking his alibi. He spent that (Tuesday) night in the Kirkwood jail where he was taken about 9 P. M. The next day, according to Ellis' testimony, he was taken to the City of St. Louis and tested with a lie detector at the St. Louis metropolitan police headquarters. That night he was lodged in jail at St. Charles, county seat of St. Charles County. He remained there until the evening of Friday, December 17, when he was brought back to headquarters where he was questioned and made his first confession. This consumed all told about two hours. He dictated the confession to a lieutenant of the patrol then read and signed it. He told that he and Jesse Sanford, also found guilty in a separate trial after severance, went to Mary Santo's house early Sunday morning; got into the house by asking for a drink of water; beat her with knucks and bottles; turned over the stove; wrapped Mrs. Santo's body in a carpet and set fire to it. Then he went through some of the dresser drawers; fled in fright; threw away his coat in the woods; met Jesse the next day and received two dollars from him as half of the money obtained by Jesse who had fled with Mrs. Santo's purse.

The chief deputy sheriff of St. Charles County testified Ellis, on the evening of Sunday, December 19, voluntarily dictated a confession to him which he wrote down in long hand and Ellis signed. In that statement Ellis repeated the facts of his earlier confession. He added that he met Jesse Sanford Saturday night, December 11 and asked Jesse to help him pull a job. He obtained the knucks from Jesse, met him the next morning and set out to do the job planned at the home of some colored people. On their way they passed Mrs. Santo's house and decided to go there. He again told how they beat Mrs. Santo with the knucks and bottles, wrapped her body in a carpet and set fire to it, ransacked the dresser drawers, became frightened at her groaning and fled.

On the morning of December 20 Ellis and some patrolmen went to the vicinity of Mrs. Santo's house to look for Ellis' coat which he

had thrown away because it was blood stained. They also went to Ellis' home where he and his mother had a conversation related in the testimony of the city marshal as follows: ''And at the time the mother says, 'Did you do this, Freddie? Are you guilty of this, Freddie?' He says, 'I am.' She says, 'I thought I raised you different to that. What happened to you?' 'Well,' he says, 'Well, it looks like the devil just got hold of me, and I was led into it.' '' Several patrolmen testified about the conversation to the same general effect.

Florence Connors, a stenographer employed at patrol headquarters testified that on December 20 Ellis repeated his confession to her.

The next day, December 21, a date which seems to have been previously set, the patrol delivered Ellis to the sheriff of Franklin County at Union where he was taken before a justice of the peace. The justice read the warrant to Ellis and told him what he was charged with. The justice advised Ellis about his right to have counsel and to have a preliminary hearing. Appellant told the justice he did not want a preliminary hearing, he wanted only to tell the truth. The justice bound him over for trial and committed him to jail at Union, Franklin County.

At the trial Ellis took the stand and testified to an alibi. He further testified the patrolmen struck him with their fists, with a rubber hose and with a leather belt. He was unable to identify anyone who had struck him because he said they stood behind him when beating him. He denied to the patrolmen he was guilty but they made him ''own up'' to the facts in his confession. Ellis said the deputy at St. Charles did not lay a hand on him, that he made a statement to the deputy there but the statement was not true. He denied ever talking to Miss Connors or even seeing her. As to the admission to his mother he said he merely meant that Sanford had gotten him in trouble with the patrol.

The admissibility of the confessions was challenged at the opening of the trial by a motion to suppress and exclude such evidence and again at the time they were offered during the trial by objections to their introduction.

One of the instructions given for Ellis told the jury that if his confessions were involuntary because of flattery, hope, torture, fear or ''as the result of long continued questioning by members of the Highway patrol'' they should reject such confessions.

Other instructions offered on behalf of Ellis, but refused, would have withdrawn from the jury's consideration any statements and confessions made by Ellis while in custody of the Highway patrol as the patrol had failed to take Ellis forthwith after apprehending him before the court or magistrate having jurisdiction of the crime.

Section 8360, R. S. 1939, Mo. R. S. A. of the State Highway Patrol Act provides: ''Any person arrested by a member of the patrol shall forthwith be taken by such member before the court or magistrate

having jurisdiction of the crime whereof such person so arrested is charged there to be dealt with according to law.'' Section 4346, a provision applicable generally to all peace officers prohibits holding any person longer than twenty hours without warrant or other process.

The principal question for decision is whether the detention of Ellis in violation of the statutes rendered his confessions involuntary as a matter of law and inadmissible as violative of his rights under the Fourteenth Amendment of the Constitution of the United States and under Article II, Section 30 of the Constitution of Missouri, 1875.

█ Wigmore (3rd Ed., sec. 823) announces the general rule that a confession is not excluded because of any illegality in the method of obtaining it or in the speaker's situation at the time of making it. See to the same effect 22 C. J. S., Criminal Law, sec. 817, pp. 1432, 3.

This State followed that principle in State v. Raftery, 252 Mo. 72, 158 S. W. 585. In that case the defendant, knowing the police were after him as being suspected of burglary, surrendered to the sheriff and gave bond for his appearance and was released. The police promptly re-arrested him, held him for an unstated period of time and subjected him to police interrogation. We said: ''There was no fact tending to show that the admissions made by defendant were not made voluntarily. The fact that he was under an illegal arrest does not render such admissions incompetent in the absence of a showing that they were not voluntary . . . 'And according to the weight of authority, a confession, if otherwise admissible, cannot be rejected for the reason that the officer to whom it was made held the prisoner in custody upon an invalid process, or without any process or legal right.' '' And see State v. Hoskins, 327 Mo. 313, 36 S. W. (2d) 909; State v. Mitchell, 339 Mo. 228, 96 S. W. (2d) 341. Directly in point is State v. Menz, 341 Mo. 74, 106 S. W. (2d) 440 where we held that the failure to release a person held for questioning within twenty hours after his arrest under Section 4346, no charge having been filed, did not render any statement or confession made thereafter presumptively involuntary.

While we do not find many cases on this subject we do find the same principle has also been generally followed in other jurisdictions, in some cases with certain qualifications. See Balbo v. People, 80 N. Y. 484, 499; People v. Trybus, 219 N. Y. 18, 113 N. E. 538; People v. Alex, 265 N. Y. 192, 192 N. E. 289, 94 A. L. R. 1033; People v. Vinci, ·295 Ill. 419, 129 N. E. 193; Cates v. State, 118 Tex. Crim. Rep. 35, 37 S. W. (2d) 1031; Annotation 94 A. L. R. 1036.

The ultimate question in these cases has been whether the confession was in fact voluntary despite the illegal detention. That officers had overstepped legal bounds was in no case condoned. It was stated in People v. Vinci, supra, that such practice deserves the severest censure and had been repeatedly condemned.

1004

██ However, there is nothing in this case to show that the detention of Ellis outside of his home county for a week before taking him to the proper authorities ██ operated as a coercive influence in bringing about his confessions. He made no claim when he was on the stand that this fact caused him any fear or.in any other way induced him to confess unwillingly. Nor is there anything in the record or any claim on his part that his failure to consult with his friends or an attorney during this period induced him to confess against his will. If there had been any evidence that these circumstances forced his confessions against his will then the trial court, in admitting the confessions in evidence, would have instructed the jury to consider such circumstances if requested to do so. In determining whether a confession offered in evidence is voluntary the jury may properly take into consideration the circumstances under which it was made.

In this case, as we have pointed out above, the court gave the instruction requested by Ellis on the question of whether his confessions were involuntary because of torture, fear, promises or long continued questioning by the patrol. This instruction fairly presented the issue of whether or not the confessions were voluntary under the facts in evidence. Therefore, the constitutional requirements were satisfied. Lyons v. State of Oklahoma, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481.

We do not find in this case the same circumstances in State v. Butts, 349 Mo. 213, 158 S. W. (2d) 790, 140 A. L. R. 1177 where we held a confession involuntary as a matter of law because it was induced by long continued questioning. We held there and repeat here with approval that mental punishment may be more cruel than physical punishment. A confession extorted by mental punishment is as incompetent as one by physical punishment. The United States Supreme Court, discussing the issue of the voluntary character of a confession, speaks of the "mental freedom" of the accused to confess or deny at the time he confesses. Ashcraft v. State of Tennessee, 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192.

On the evidence in this case we hold the court did not err in refusing to give the instructions requested by Ellis withdrawing his confessions from consideration by the jury on the theory the delay in taking him before a magistrate made them involuntary as a matter of law.

In support of his position that his confessions are involuntary as a matter of law and therefore inadmissible, Ellis relies on the case of McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819. In that case the defendants were not promptly brought before a United States Commissioner or Judge, but were detained by the officers and subjected to unremitting questioning for two days. Confessions were obtained. The United States Supreme Court held the confessions should have been excluded as a matter of law, not on constitutional

grounds, but because the officers had violated the United States Statutes in failing promptly to take the defendants before a committing magistrate. The court announced the basis of its decision rested on its supervisory authority over the administration of criminal justice in the Federal Courts and its authority to formulate rules of evidence to be applied in Federal criminal prosecutions. It said: "In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions cannot stand, we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by Federal courts in the trial of criminal cases." Anderson v. United States, 318 U. S. 350, 63 S. Ct. 599, 87 L. Ed. 829 follows the McNabb decision. A later decision, United States v. Mitchell, 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 1140 points out that the McNabb case was not there applicable because "there was no disclosure induced by illegal detention, no evidence was obtained in violation of any legal rights" and permitted the use of a confession given when first arrested although the defendant was not thereafter promptly taken before a committing magistrate. As those cases dealt with the admissibility of evidence in criminal trials in the Federal Courts the rule they announce is not binding here and is not apposite inasmuch as we have long followed a different rule. State v. Golden, 353 Mo. 585, 183 S. W. (2d) 109. And see Malinski v. People of New York, 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 738.

 Ellis filed a motion to quash the information because no preliminary examination was accorded him. From the evidence adduced on such motion it is clear that he waived such examination. The court properly overruled the motion. Section 3893, R. S. 1939, Mo. R. S. A. provides that a preliminary examination is not required where it is waived. See State v. McBride (Mo.), 12 S. W. (2d) 46; State v. Mason, 322 Mo. 194, 14 S. W. (2d) 611.

Ellis had a fair and impartial trial. On the record before us the judgment must be affirmed.

Judgment affirmed and sentence ordered executed.

Date of execution March 29, 1946.

Judgment Affirmed and Sentence ordered Executed. *Ellison, Gantt* and *Leedy, JJ.,* concur; *Clark, C. J.,* concurs; *Tipton, J.,* dissents in separate dissenting opinion; *Hyde, J.,* concurs in separate concurring opinion in which all concur except *Tipton, J.,* who dissents.

 HYDE, J. (concurring).—The real question in this case is not whether the officers of the Missouri State Highway Patrol complied with Sections 4346 and 8360, R. S. 1939, Mo. Stat. Ann. The sole question is whether or not the confessions of these defendants were voluntary in fact.

1006

■ It is my view that we should adhere to the standard of admissibility of confessions of whether or not the particular confession is voluntary in fact. That has always been the rule of this Court. [State v. Menz, 341 Mo. 74, 106 S. W. (2d) 440 and cases therein cited.] Likewise, as shown by these authorities, this is a jury question unless its involuntary character so conclusively appears that it must be held to be involuntary as a matter of law. McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819, establishes no rule of constitutional law which requires us to change this standard. In Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 94, 88 L. Ed. 1192, the United States Supreme Court recognized the rule that the test is the voluntariness of the statement, by basing its decision (reversing the case because conviction was based on an inadmissible confession) upon its conclusion "that if Ashcraft made a confession it was not voluntary but compelled." In Lyons v. Oklahoma, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481, a second statement (after an admittedly inadmissible involuntary statement) was held to be voluntary and therefore admissible. If the confession is voluntary in fact, and is true, the defendants' rights are not violated by putting it in evidence. Some one must determine these fact issues and our system is to leave them to the jury, when they must be decided on conflicting evidence.

■ I do not see how there can be any question as to the voluntariness of Sanford's confession. He made it during the day he was arrested and well within the 20 hour period required by Section 4346, R. S. 1939, Mo. Stat. Ann. He had corroborated it by showing the officers where the victim's purse had been left. He further corroborated it by making the same statements to others who were not officers and had no authority over him. (See 22 C. J. S. 1439, sec. 819.) He did not testify at the trial. I do not think there is any substantial evidence to show that his confession was involuntary.

■ In the Ellis case, the questioned confession was later corroborated by an acknowledgment of his guilt to his mother. The dissenting opinion herein relies strongly on State v. Owens, 302 Mo. 348, 259 S. W. 100, which was an illegal search and seizure case. It seems to me that there is a vast difference between the use of evidence taken by an illegal search and seizure and the use of a voluntary confession made during illegal detention. Of course, evidence taken by illegal search and seizure is an involuntary disclosure thereof on the part of the person from whom it is taken. It should unquestionably be in the same class with an involuntary confession. But a voluntary confession although made during illegal detention is still a voluntary disclosure.

Moreover, the officers who held Ellis were not acting illegally in taking him into custody. They had the right to arrest him and were charged with the duty of investigating this crime. They should have taken him before a magistrate as the statute directs so that formal charges against him could have been made. However, he knew why

he was being held and so did members of his family who also knew where he was being held. Of course, failure to comply with Sections 4346 and 8360 could have a bearing on the voluntariness of a confession but (as the opinion of Douglas, J. points out) Ellis made no claim that it did in this case. He made a subsequent confession at another place, out of the presence of the Patrol Officers. The acts of which Ellis complained as affecting the voluntariness of his confession were submitted to the jury, but they did not believe that these acts were committed. [See State v. Hawkins (Mo. Sup.), 165 S. W. (2d) 644.] His testimony concerning them was not convincing. He identified none of the officers he knew with these acts, and could not say who did it. While there was sufficient evidence to have supported a jury verdict that his confession was involuntary, I do not think it was established as a matter of law.

I, therefore, concur in the opinions of DOUGLAS, J., in these cases. All concur except *Tipton, J.*, dissenting.

TIPTON, J. (dissenting).—I am unable to agree with the majority opinions. They dispose of these cases as though they involve a mere technical violation of the statute by the Missouri State Highway Patrol, and in so doing fail to consider and give full import to certain undisputed and significant facts. Furthermore, the opinions fail to give meaning and force to the unambiguous language of the statute.

 The statute, Section 8360, Mo. R. S. A., in unmistakably plain language, says: "Any person arrested by a member of the patrol shall forthwith be taken by such member before the court or magistrate having jurisdiction of the crime whereof such person so arrested is charged there to be dealt with according to law." So, in the plainest of language, we have a specific limitation on the arresting power of the officers of the Missouri State Highway Patrol.

"This directive is not something which the officer is free to comply with or ignore according as he may think the exigencies of the situation demand; it is a fundamental imperative designed to safeguard the individual in a free land against the arbitrary exercise of power." Runnels v. United States, 138 Fed. (2d) 346, 1. c. 347. As is well known, the underlying policy of the statute is directed against "the misuse of the law enforcement process." "It aims to avoid all the evil implications of secret interrogation of persons accused of crime" and, it may be frankly added, to prevent "the third degree" and coerced confessions. McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819; Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192. "They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding. . . . Experience has therefore counseled that safe-

guards must be provided against the dangers of the overzealous as well as the despotic. . . . Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. . . . It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection. A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application.'' McNabb v. United States, supra, 1. c. 342, 343, 344. See also United States v. Haupt, 136 Fed. (2d) 661.

In these cases had there been a mere technical violation of this statute by the Highway Patrol in its failure to ''forthwith'' take Sanford and Ellis before a court or magistrate with jurisdiction of the crime with which they were charged, it would be reasonable to argue that no more was involved than the technicality of a mere illegal arrest, and, therefore, their confessions given during the period of illegal detention would not be involuntary. That is all that was involved in State v. Raftery, 252 Mo. 72, 158 S. W. 585, State v. Hoskins, 327 Mo. 313, 36 S. W. (2d) 909, and State v. Mitchell, 339 Mo. 228, 96 S. W. (2d) 341. In principle, no more is involved in State v. Menz, 341 Mo. 74, 106 S. W. (2d) 440, in which it was held that the mere fact that one had been detained more than the statutory twenty hours did not, as a matter of law, constitute duress as to a confession given during that time. However, it should be noted that Menz was detained in custody at the county seat. *His people knew where Menz was detained* for his sister visited him the second day of his detention and subsequently he was visited by his father.

But in these cases there was not a mere failure to take Sanford and Ellis before a committing magistrate in the county of the crime; Sanford and Ellis were taken to another county. They were taken to the Highway Patrol's headquarters in Kirkwood and when they were not being subjected to examination or ''work'' (Ashcraft v. Tennessee, supra) they were kept in the St. Charles jail.

Sanford and Ellis murdered Mrs. Santo on the 12th day of December, 1943. Sanford was taken into custody while at work at the quarry at Pacific on the 14th day of December, and was detained at Kirkwood and in the St. Charles jail until the 21st day of December. Ellis was arrested on the 14th day of December ▆ and detained until the 21st day of December. On that day they were taken before a proper committing magistrate at Union, the county seat of Franklin County. They waived preliminary hearings and were committed to the Franklin County jail where they remained until tried in March, 1944. The affidavit for an information was dated December 15th, three days after the murder.

Sanford was taken into custody about eleven-thirty on the morning of the 14th and immediately taken to Troop C headquarters in Kirkwood where he was questioned by two troopers and a lieutenant. From seven o'clock that night until nine-thirty or ten o'clock he was questioned. The members of the patrol who engaged in questioning him were not all present all of the time when he was being questioned, consequently, no member of the patrol was able to say what had occurred while the others were examining him; further, all those who engaged in the questioning did not testify. About ten o'clock Sanford was returned to Pacific in a patrol car to search for Mrs. Santo's pocketbook and was again brought back to patrol headquarters where he was kept until three-thirty or four o'clock when he completed his statement that he had been making. The next day, or night, he was returned to patrol headquarters and again questioned. He was questioned each night he was there and when he was not in Troop C headquarters he was in the St. Charles jail.

Ellis was subjected to similar treatment. There is the difference that Ellis did not confess during the first two or three days of his detention. His confession is dated December 17th. During the first two or three days he claimed an alibi. The second or third day he was taken to St. Louis and subjected to a lie detector test at the St. Louis metropolitan police headquarters. Members of Ellis' family were brought to the patrol's headquarters in Kirkwood but it should be carefully noted that they were not brought there for the purpose of visiting him or talking with him but for the purpose of checking his alibi.

Aside from these admitted facts there are additional undisputable facts which the majority opinion does not consider, facts which condemn the detention in these cases and definitely stamp the confessions given the patrol as involuntary. In the first place, Sanford is an illiterate negro. He went to school in the first grade only and it is doubtful that he can read or write other than to sign his name. In the second place, the lieutenant testified that the secretary read the confession to him; the secretary said that the statement was read to him but that she did not do it. There is no other evidence on the subject. We therefore have a confession admitted in evidence against Sanford which he did not read nor which was not read to him. For this reason alone the written confession should not be admitted. In the third place, during the time Sanford was detained at Troop C headquarters and in the St. Charles jail from December 14th to December 21st he was not visited by members of his family or counsel. In the fourth place, it does not appear that either Ellis or Sanford was ever advised of his rights in any manner by the patrol. In the fifth place, and most important of all, is the long, unsatisfactorily explained detention of seven days in direct violation of the statute.

In view of the policy of the statute and these additional facts which clearly violate it, this Court should do just as the Supreme Court of the United States did and exercise its constitutional supervisory power over trial tribunals, (Const. Mo. 1945, Art. V, Sec. 4) and ensure, as far as possible, complete fairness in the administration of criminal justice and the integrity of the law enforcement process. McNabb v. United States, supra; Anderson v. United States, 318 U. S. 350, 63 S. Ct. 599, 87 L. Ed. 829; United States v. Mitchell, 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 1140; Skiba v. Kaiser, 352 Mo. 424, 178 S. W. (2d) 373.

 The majority opinion is based upon Professor Wigmore's theory that a confession is not involuntary and should not be excluded because of the illegality of the method by which it was obtained or because of the accused's situation at the time of making it. 3 Wigmore, Evidence, Secs. 815-867. The principle of Professor Wigmore's theory has been advisedly rejected by this Court en Banc and we believe that a consideration of the subject further demonstrates that these confessions procured by the Highway Patrol during the period of this unexplained, unlawful detention should be condemned and excluded as involuntary. Professor Wigmore not only contends that confessions should not be excluded because they were illegally obtained but vehemently contends that evidence obtained by an illegal search and seizure should not be excluded or suppressed because of the illegal manner in which it was obtained. His position is that an offending officer may be punished in some appropriate manner, either by the court or at the instance of the accused, and that it is a perversion of the rules of evidence to use them as a means or method of indirect punishment by excluding the illegally obtained evidence. 8 Wigmore, Evidence, Secs. 2183-2184b, pp. 4-50. In State v. Owens, 302 Mo. 348, 259 S. W. 100, 32 A. L. R. 383, Professor Wigmore's views were urged upon the Court en Banc and the whole subject was very carefully considered and his theory was rejected.

Neither the State nor the Federal Constitution forbids the use of evidence obtained by an illegal search and seizure, yet we have adopted the view that evidence so obtained is not admissible against a defendant in a criminal case for the reason that the admission of such evidence violates his constitutional security against unreasonable search and seizure. State v. Owens, supra; State v. Lock, 302 Mo. 400, 259 S. W. 116. The reason for excluding the evidence so obtained is that the sole object of a search and seizure is to obtain evidence, and if the courts permit the use of illegally obtained evidence, the individual's constitutional security or guaranty against unlawful search and seizure is of no value. When the officers make an unlawful search and illegally seize property they directly violate the Constitution and a right specifically reserved to the accused, and the exclusion of evidence thus obtained is the only adequate means of giving effect to and pro-

tecting that right. State v. Wilkerson, 349 Mo. 205, 159 S. W. (2d) 794. The contrary view "reduces the Fourth Amendment to a form of words." Silverthorne Lumber Co. v. United States, 251 U. S. 385, 64 L. Ed. 319, 40 S. Ct. 182. So it is with a confession obtained under the circumstances of these cases and in direct violation of this positive statute. It is not enough merely to censure with words the State's illegal conduct and its unlawfully obtained evidence. "The State argues further that the constitutional provision is not self-enforcing, and no statute has been passed to punish an offending officer or provide a remedy to the person injured for the infraction of his constitutional right. It is true there is no adequate remedy available to the person injured whereby he may obtain redress after the act. He would have an action for an unlawful trespass or for assault, at common law. The Constitution adds nothing to his rights in that respect. *The only remedy which can possibly benefit him is a preventive one.* . . . There is in fact no remedy, no method, by which the citizen can receive the protection of the Constitution except the method here contended for by the appellant. No case is mentioned, and I believe none can be found, where the constitutional right was protected to the citizen except in the suppression of evidence discovered by unlawful search." State v. Owens, supra, Mo. l. c. 375. (Italics mine.)

It is true that up to the present the Supreme Court of the United States has not held that a confession obtained in the circumstances of these cases and the McNabb case and used in evidence against an accused is violative of his right to due process under either the Fifth or Fourteenth Amendment of the Constitution of the United States, but the question has never been before that Court in such a manner that it was necessary to decide it. Furthermore, it is not a mere question of procedure. If it were we would not be bound by the views of the Supreme Court of the United States. It is well established that if a confession is given or obtained under circumstances that its use as evidence in a state criminal proceeding violates due process, it is not consistent with the fundamental principles of liberty and justice, and the Supreme Court of the United States will set the conviction aside as violative of the Fourteenth Amendment. Lyons v. Oklahoma, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481; Ashcraft v. Tennessee, supra; Lisenba v. California, 314 U. S. 219, 62 S. Ct. 280, 86 L. Ed. 166; Chambers v. Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716.

"The question of how specific an instruction in a state court must be upon the involuntary character of a confession is, as a matter of procedure or practice, solely for the courts of the state." Lyons v. Oklahoma, supra, U. S. l. ██ c. 601. But that is not enough for these cases. Ellis claimed, among other things, that his confession was coerced by physical violence. In addition to the Highway Patrol's confessions, there were also confessions to private individuals, a news-

paper photographer, a reporter, a city marshal after commitment to the Franklin County jail, and to the chief deputy sheriff at St. Charles. The confessions made to private individuals are deemed voluntary because they were not made to persons in authority. 3 Wigmore, Evidence, Secs. 827-830; State v. Williamson, 339 Mo. 1038, 99 S. W. (2d) 76. The court instructed the jury as to any confessions claimed to have been secured by force. State v. Gibilterra, 342 Mo. 577, 116 S. W. (2d) 88; State v. Di Stefano, 152 S. W. (2d) 20; State v. Aitkens, 352 Mo. 746, 179 S. W. (2d) 84. The usual instruction on voluntary or involuntary confession by reason of force or duress does not include the fact of Ellis' illegal detention in violation of the statute.

Sanford's case is on an entirely different footing. Sanford did not claim that his confession was forced by physical violence. He relied solely upon the fact of his illegal detention in violation of the statute. The trial court refused his instructions hypothesizing a confession obtained by reason of that fact. Had the trial court instructed the jury on this subject as the New York courts elaborately do (People v. Malinski, 292 N. Y. 360, 55 N. E. (2d) 353) and thus protected the accused in his rights, it might have been that due process would not have been denied him.

That was not done in these cases. Not only were the State and the Highway Patrol not penalized for their unlawful conduct but these circumstances were not even considered in determining whether the confessions secured by the Patrol were voluntary.

I think the confessions given the Patrol, under the circumstances, were involuntary as a matter of law and violative of due process under both the State and Federal Constitutions. Skiba v. Kaiser, supra. If not, then certainly "the Supreme Court in the McNabb case added to the various tests to be taken into consideration by the trial judge a new one, that of whether or not a man was promptly taken before the United States Commissioner", (United States v. Klee, 50 F. Supp. 679, l. c. 685) or, in this case by the same token, whether the confessions were obtained by reason of the long, unsatisfactorily explained detention of seven days in direct violation of the statute, a force as coercive as physical violence in the circumstances of these cases. Ashcraft v. Tennessee, supra.