STATE v. JESSE SANFORD, Appellant.—No. 39329.—193 S. W. (2d) 35.

Court en Banc, February 11, 1946.

Rehearing Denied, March 11, 1946.

*R. H. Schaper* and *Frank W. Jenny* for appellant.

*J. E. Taylor,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

1014

DOUGLAS, J.—Jesse Sanford, appellant, was found to be one of the murderers of Mary Santo and was sentenced to death. He and Fred Ellis beat her into insensibility at her home near Pacific in Franklin County causing her death. They were jointly charged with murder but tried separately after severance. Fred Ellis was also sentenced to death. In their separate appeals they present identical issues. We have discussed these issues in the Ellis appeal (State v. Ellis, 354 Mo. 998, 193 S. W. (2d) 31). What is said there is applicable and decisive here.

The assault on Mary Santo was on Sunday morning, December 12, 1943. Sanford was taken into custody by members of the State Highway Patrol about 11:30 o'clock on the morning of Tuesday, December 14 at the silica plant in Pacific where he was working. When the patrolmen were taking him by automobile to the headquarters of Troop C at Kirkwood in St. Louis County he told them he knew who murdered Mary Santo and then told of loaning his knucks to Ellis. After reaching headquarters Sanford was questioned for about an hour. Questioning was later resumed sometime after 7 o'clock that evening. About 9 o'clock Sanford admitted he and Ellis had beaten Mrs. Santo. Then Sanford guided the patrolmen to the place where he had thrown away Mrs. Santo's purse which he had taken before fleeing from her house. The purse was found about 11 o'clock and the group returned to headquarters. The stenographer employed by the patrol was summoned from her home, arriving at headquarters about 1 A. M. Sanford dictated the following confession to her, which she transcribed and Sanford signed.

"Kirkwood, Missouri

"December 15, 1943

"We were in Sleet's Saturday night and Sunday morning until around 1:00 A. M., and we were gambling. Freddie got broke. ▮ I got broke a little bit. I came out of Sleet's and went in Haley's tavern and about that time Freddie came out of Sleet's and I was coming out of Haley's door. Freddie asked me about pulling a job tonight. I said, 'Freddie, there ain't no use pulling a job tonight.' He said, 'Oh, hell boy, come on, let's get some Christmas money.' I said where are you going Freddie? He said, 'let's go over by Mellvina's house.' I said let's go Freddie. After we got up by the white people's cemetery, 'I wonder who lives in that white house down there?' I said a white woman lives down there and a couple others. I said. let's go down there. After we got down there the dog barked. The woman came out on the front porch. She wanted to know what we wanted. I said I heard she had a goat to sell. She said no, that she had not, that Henry killed the goat. Freddie said, 'well how about a glass of water.' She said come on in and I'll give you some water. After she poured one (1) glass of water out she got another glass of water and when she came around to pour the water Freddie hit her with a pair of knucks. Then she squealed. Then she threw up both hands. Then she fell into a clench with Freddie. Then I pulled her back from him, and when I pulled him back he hit her again. She said, 'I know what you want.' 'You want money and I'll give you some money.' I said Freddie let her get us some money and he said no that she was liable to squeal. Freddie hit her again and knocked her down in the middle of the doorway. After he knocked her down, I hit her with a beer bottle. She groaned and said 'don't you all kill me' and she reached her hand around the corner to get a beer bottle. Then she took it and was going to hit him with it. I took it away from her and hit her across the head. Then after Freddie got through hitting her he wrapped her up in a rug and set the rug on fire. Then he, Freddie, went through a door through the bedroom and out on the front porch. He said, 'Well, I'm going.' I said, 'alright Freddie.' Freddie left and went down through the barnyard. He went on the hill and stopped at the colored cemetery. I came out the back door, went around the home and went across the hill. I met Freddie at the colored cemetery at the fork in the road. He wanted to know how much money I had. I told him that I didn't know yet. He said well I'll meet you at home. He, Freddie, left. After he left I went the other way. I came down off the hill and came to my home. I met him by the old jail and he asked me how much I got. I told him I got $3.00, but I also got $5.00 that I didn't tell him about. He said, 'God damn nigger don't you squawk.' I said I won't Freddie. Then I went on home. That's all.

"(Signed)   Jesse Sanford

"Witnesses:
"M. Dace
"D. E. Arnold."

A photographer from the Post Dispatch testified that Sanford repeated the same confession to him and to a reporter at headquarters the same night or early morning.

After signing his confession Sanford was taken to the St. Charles jail in St. Charles County. About 4 o'clock that afternoon (December 15) he repeated his confession to a deputy sheriff in the St. Charles jail. The deputy wrote it down in long hand and Sanford signed it.

On Tuesday December 21 Sanford was returned to headquarters at Kirkwood and was then taken by the patrol to Union, the county seat of Franklin County, and turned over to the sheriff. The sheriff took him before a justice of the peace where Sanford waived his preliminary examination and was committed to jail at Union.

At the trial Sanford did not take the stand and offered no evidence in denial of the charge.

Section 8360, R. S. 1939, Mo. R. S. A. of the State Highway Patrol Act provides: "Any person arrested by a member of the patrol shall. forthwith be taken by such member before the court or magistrate having jurisdiction of the crime whereof such person so arrested is charged there to be dealt with according to law." Section 4346, a provision applicable generally to all peace officers, prohibits holding any person longer than twenty hours without warrant or other process.

When Sanford was taken into custody by the Highway Patrol no warrant had been issued for his arrest. When such a warrant was later issued is not shown in evidence. The State does not attempt to deny the above statutes were violated.

The principal question for decision here, as in the Ellis case, is whether the delay in taking Sanford before the magistrate rendered his confessions involuntary as a matter of law and inadmissible for that reason.

Our decision in the Ellis case is controlling here. The observation might be made that the first confession in this case was given much sooner after apprehension than in the Ellis case. Sanford first admitted his guilt some eight hours after he was taken into custody, then guided the patrolmen to Mrs. Santo's purse and within twelve hours signed a written confession. All of the evidence points to the voluntary character of the confessions. There is no claim they are involuntary in fact; only that they are involuntary as a matter of law.

In this case the evidence likewise shows Sanford waived a preliminary examination and sustains the action of the trial court in overruling the motion to quash the information because of no preliminary examination.

Sanford had a fair and impartial trial. On the record before us the judgment must be affirmed.

Judgment affirmed and sentence ordered executed.
Date of execution. March 29, 1946.
Judgment affirmed and sentence ordered executed.

*Ellison, Gantt* and *Leedy, JJ.,* and *Clark, C. J.,* concur; *Tipton, J.,* dissents in separate dissenting opinion; *Hyde, J.,* concurs in separate concurring opinion in which all concur, except *Tipton, J.,* who dissents.