FORD, J.
 

 By an information the defendant was accused of the crime of violation of section 11500 of the Health and Safety Code. It was alleged that on or about May 12, 1961, he “did wilfully, unlawfully and feloniously have in his possession a narcotic, to wit, methadone, also known as amidone.” (Cf.
 
 People
 
 v.
 
 Ballard,
 
 145 Cal.App.2d 94, 98 [302 P.2d 89].) In a trial by jury, he was found guilty. His appeal is from the judgment
 
 [1]
 
 and from the order denying his motion for a new trial.
 

 Two contentions are made by the defendant. The first is that his arrest in his home was unlawful because the officers did not comply with the provisions of section 844 of the Penal Code
 
 [2]
 
 and that, consequently, the evidence seized in his home as a result of the search thereof should not have been admitted at the trial. His other contention is that evidence of statements made by him should have been excluded because at the time thereof he was being unlawfully detained.
 

 
 *421
 
 With respect to the issues presented on this appeal there was evidence of the following facts. On May 12, 1961, at about 5 o’clock in the afternoon Tony T. Martinez, an agent of the State Bureau of Narcotic Enforcement, met a man named Sandoval at Main and Broadway in Santa Maria. Sandoval offered to obtain a narcotic for him and said that he knew a woman who was “holding.” He did not mention the defendant’s name. Sandoval directed the officer to Lakeview and Hillview Boulevard. After the two men arrived there in the officer’s automobile, the officer gave Sandoval $50 in bills that had been treated with fluorescent powder. Sandoval left the ear, which was parked on Lakeview at the southwest corner of the intersection, and “trotted” southerly down Hill-view in the direction of the defendant’s house. After Sandoval turned away from the street and passed a tree, the officer lost sight of him. Officer Martinez waited some time and then moved from his parking place and drove in a southerly direction on Hillview. When the officer was returning in a northerly direction on that street, he again observed Sandoval who was then approximately 10 feet from the defendant’s house. The officer saw him “trot back to where the State vehicle was supposed to be parked.”
 
 [3]
 
 He drove up to Sandoval. Sandoval entered the automobile and handed the officer five paper bin dies (which, as expressed in the opinion of a chemist given at the trial, contained the narcotic amidone). Sandoval did not mention the name of the person from whom he had obtained the packets but indicated that the person was a woman. He said that he had received a narcotic injection at the residence. Officer Martinez then drove the vehicle to the next street where Agents Shoemaker and Mannin were waiting. Sandoval was placed under arrest.
 

 
 *422
 
 After Officer Martinez informed Officers Shoemaker and Mannin that he had given Sandoval $50 and Sandoval had returned with the five paper bindles, Officers Shoemaker and Mannin entered the defendant’s house where he and a woman named Vivian Gonzales lived.
 
 [4]
 
 Officer Shoemaker’s testimony was in part as follows: “Q. Did you see anyone inside the house before entering ? A. No, sir. I believe there was a front window, but the blinds were pulled. ... Q. Was the door closed? A. Yes, sir, it was. Q. Did you knock on the door? A. No, sir, I did not. Q. Was the door hooked ? A. As best as I can recall, I entered the house, and the screen door was latched. Q. And how did you open the streen [screen] door? A. I pulled on the street door—the handle. Q. And the latch broke? A. Broke or bent, I don’t know which. It opened. Q. You used some force on it? A. Yes, sir. Q. You then
 
 *423
 
 entered the house? A. Yes, sir. Q. Did you or did you not hear anyone say anything before entering into the house? A. No, sir, I did not. Q. Did you hear anything before entering the house? A. No, sir. Q. What was the first thing that you said after entering into the house? A. I don’t believe I said anything when I entered the house.” He further testified that he did not knock or state his purpose before entering the house.
 

 When the officers entered, there were five or six persons in the front room, including the defendant and Vivian Gonzales. Mrs. Gonzales ran for the bathroom. Two officers seized her. Prom her hand was wrested a bindle and from the right front pocket of her “pedal-pushers” were taken the marked bills in the amount of $50. At the time Officer Shoemaker believed that the various bindles or packets contained heroin, but he later learned, after a chemical analysis had been made, that the substance was amidone.
 

 The defendant admitted that a bathrobe hanging in the bedroom was his, but said that both he and Vivian Gonzales ivore it; in each of two pockets was found a hypodermic kit. On the top of the dresser was a knife with an open blade; a finger stall was alongside the knife. On the tip of the blade was a whitish powder (which, as expressed in the opinion of a chemist given at the trial, was amidone). The defendant said that the knife was his, but he denied knowledge of the traces of white powder on it. He said that he was familiar with one of the hypodermic kits found in the bathrobe and that it belonged to him.
 

 Evidence was received with respect to information which the officers had obtained prior to May 12, 1961. About February 1961, Officer Martinez approached a man named Ralph and told him he was looking for heroin. Sandoval joined them. They drove to the defendant’s house and Sandoval went to the door. He returned to the automobile and said that the “old man” did not have any “to deal,” but that they were “shooting” in the house with what they had. Officer Martinez informed Officers Shoemaker and Mannin about the incident. Officer Shoemaker testified that he had heard about the activities of Vivian Gonzales for at least four years. He further testified in part as follows: ‘ ‘ The first definite information I received was approximately a year and a half ago in Fresno, from a reliable informant, that had made at least four or five other eases for us. This informant told us that Vivian was
 
 *424
 
 making periodic trips to Fresno to score for Heroin—that she was living with what was described as an old white man who was keeping her and furnishing her some of the money to come to Fresno, and this person had been to the house of Vivian and the defendant, and she described it in general terms, its location. That was the extent of the information. Then I also received the information from the informant that, on that incident that Agent Mannin testified to, that she was in Fresno to score for Heroin. Q. In the fall of 1960, did you receive information from a reliable informant in regard to further activities of selling by Mrs. Gonzales or Mr. Gauthier ? A. Yes, I did. I contacted an informant in Santa Maria who had made three cases for us in San Luis Obispo, and he stated that Vivian and the defendant [Gauthier] were living at this house and engaged in selling and using and, in the possession of narcotics, and he drove me by the house and pointed it out. Q. Is this the same house that’s been described before the jury and Court? A. Yes, sir.” In the late fall of 1960 Officer Shoemaker had the house under observation for three or four hours early one morning.
 

 At the trial, Mrs. Gonzales was called as a witness by the People. On May 12, 1961, she was 33 years old. She and the defendant were living in the house which the officers entered. She had returned there about four days before, after having been in the hospital. The defendant paid the rent and the household expenses. On May 12, 1961, she knew Officer Shoemaker, having seen him before. During the trial it was stipulated that the defendant was 58 years old.
 

 The defendant’s attack upon the validity of the search and seizure and of his arrest is based solely upon the claim that the manner of the entry of the officers into the house was illegal and in violation of his constitutional rights. At the trial he did not assert that there was a lack of probable cause for the arrest without a warrant of the person in the house who had apparently sold a narcotic to Sandoval a short time before such entry.
 
 [5]
 
 Such a sale, if made, was a felony. (Health & Saf. Code, § 11501.) If the entry and subsequent
 
 *425
 
 arrest of Vivian Gonzales were proper, incident to such arrest the officers were entitled to make a reasonable search of the house and to seize the articles to which reference has been made. Moreover, if such conduct of the officers was justified, the arrest of the defendant was proper in view of the reasonableness of the inferences that the knife found on the bedroom dresser was his and that the substance on the blade thereof was a narcotic. (See
 
 People
 
 v.
 
 Ingle,
 
 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577].)
 

 In support of his position upon the determinative question of the lawfulness of the entry, the defendant places his reliance primarily on
 
 Miller
 
 v.
 
 United States,
 
 357 U.S. 301 [78 S.Ct. 1190, 2 L.Ed.2d 1332], and
 
 Mapp
 
 v.
 
 Ohio,
 
 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081], Unless the reasoning of the Supreme Court of the United States in those cases compels a different result, the pertinent precedents in this state require that the trial court’s resolution of the problem be upheld. Thus, in a case in which there was a similar factual situation, this court said: “The appellant cannot complain that the officers entered the house without having made a demand for admittance and given an explanation of the purpose for which admittance was desired. It appears to have been probable that if such had been done, incriminating evidence would have been destroyed.’’
 
 (People
 
 v.
 
 Montano,
 
 184 Cal.App.2d 199 [7 Cal.Rptr. 307], at p. 205; see also
 
 People
 
 v.
 
 Hammond,
 
 54 Cal.2d 846, 854 [9 Cal.Rptr. 233, 357 P.2d 289];
 
 People
 
 v.
 
 Maddox,
 
 46 Cal.2d 301, 306-307 [294 P.2d 6];
 
 People
 
 v.
 
 Regalado,
 
 193 Cal.App.2d 437, 442 [14 Cal.Rptr. 217];
 
 People
 
 v.
 
 Covan,
 
 178 Cal.App.2d 416, 418 [2 Cal.Rptr. 811];
 
 People
 
 v.
 
 Miller,
 
 162 Cal.App.2d 96, 98 [328 P.2d 506];
 
 People
 
 v.
 
 Shelton,
 
 151 Cal.App.2d 587, 588 [311 P.2d 859];
 
 People
 
 v.
 
 Sayles,
 
 140 Cal.App.2d 657, 661 [295 P.2d 579].) In the
 
 Shelton
 
 case, the court stated (151 Cal.App.2d, at p. 588) : “The cases hold that where compliance with this provision [‘after having demanded admittance and explained the purpose for which admittance is desired’] would probably frustrate the arrest or permit the destruction of incriminating evidence compliance is not required.’’
 

 Miller
 
 v.
 
 United States, supra,
 
 357 U.S. 301, is factually similar to the case presently before this court. However, it is to be noted that the Supreme Court considered the problem there presented from the standpoint of statutory rather than constitutional law. Thus, the court said (357 U.S., at pp. 305-306): “The lawfulness of the arrest of petitioner de
 
 *426
 
 pends upon the power of the arresting officers to ‘break’ the doors of a home in order to arrest without warrant persons suspected of having committed narcotics offenses. Agent Wilson did not have statutory authority to arrest without a warrant although Officer Wurms, as a member of the Metropolitan Police Department, did have such authority. This Court has said, in the similar circumstance of an arrest for violation of federal law by state peace officers, that the lawfulness of the arrest without warrant is to be determined by reference to state law.
 
 United States
 
 v.
 
 Di Re,
 
 332 U.S. 581, 589 [68 S.Ct. 222, 92 L.Ed. 210];
 
 Johnson
 
 v.
 
 United States,
 
 333 U.S. 10, 15 [68 S.Ct. 367, 92 L.Ed. 436, 441], By like reasoning the validity of the arrest of petitioner is to be determined by reference to the law of the District of Columbia.
 

 “In making reference to that law we are mindful of our policy of not interfering with local rules of law fashioned by the courts of the District of Columbia.
 
 Fisher
 
 v.
 
 United States,
 
 328 U.S. 463, 476 [66 S.Ct. 1318, 90 L.Ed. 1382, 1391];
 
 Griffin
 
 v.
 
 United States,
 
 336 U.S. 704, 715 [69 S.Ct. 814, 93 L.Ed. 993, 999]. But the Government agrees with petitioner that the validity of the entry to execute the arrest without warrant must be tested by criteria identical with those embodied in 18 U.S.C. § 3109, which deals with entry to execute a search warrant. That section provides that an officer, executing a search warrant, may break open a door only if, ‘ after notice of his authority and purpose, ’ he is denied admittance. The Government states in its brief that, ‘where an arrest is made on probable cause rather than a warrant, these statutory requirements must be met before an officer can force entry into an apartment. ’ These statutory requirements are substantially identical to those judicially developed by the Court of Appeals for the District of Columbia in
 
 Accarino
 
 v.
 
 United States,
 
 85 U.S. App. D.C. 394, 403, 179 F.2d 456, 465. Since the rule of
 
 Accarino
 
 bears such a close relationship to a statute which is not confined in operation to the District of Columbia, we believe that review is warranted here.
 
 Cf. Del Vecchio
 
 v.
 
 Bowers,
 
 296 U.S. 280 [56 S.Ct. 190, 80 L.Ed. 229];
 
 Carroll
 
 v.
 
 United States,
 
 354 U.S. 394, 414 [77 S.Ct. 1332, 1 L.Ed.2d 1442, 1454], ”
 
 [6]
 

 
 *427
 
 In the course of the court’s opinion in the
 
 Miller
 
 case, a quotation was made from
 
 Semayne’s Case,
 
 5 Co. Rep. 91a, 11 E.R.C. 629, 77 Eng. Repr. 194 (1603) which was in part as follows (357 U.S. at p. 309) : “
 
 ‘But before he
 
 [the sheriff]
 
 breaks it
 
 [“the party’s house”],
 
 he ought to signify the cause of his coming,
 
 and to make request to open doors. . . .’ (Emphasis supplied.) ’ ’ The opinion then continued as follows: “The requirement stated in
 
 Semayne’s Case
 
 still obtains. It is reflected in 18 U.S.C. § 3109, in the statutes of a large number of States [reference being made in footnote 8 to statutory provisions, including section 844 of the California Penal Code] and in the American Law Institute’s proposed Code of Criminal Procedure, § 28. It applies, as the Government here concedes, whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant. There are some state decisions holding that justification for noneomplianee exists in exigent circumstances, as, for example, when the officers may in good faith believe that they or someone within are in peril of bodily harm,
 
 Read
 
 v.
 
 Case,
 
 4 Conn. 166 [10 Am.Dec. 110], or that the person to be arrested is fleeing or attempting to destroy evidence.
 
 People
 
 v.
 
 Maddox,
 
 46 Cal.2d 301 [294 P.2d 6].
 

 “But whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances is not a question we are called upon to decide in this case. The Government makes no claim here of the existence of circumstances excusing compliance.
 
 The Government concedes that compliance was required but argues that ‘compliance is evident from the events immediately preceding the officers’ forced entry.’ ” (Emphasis added.)
 

 In the
 
 Miller
 
 ease the Supreme Court did not undertake to set forth that the rule therein stated is one required by constitutional principle. Moreover, it is clear that in the present ease there were circumstances excusing compliance with section 844 of the Penal Code in that the factual situation gave ample support to a belief that any delay in entry would probably result in the destruction of contraband. Apropos is the following statement in
 
 People
 
 v.
 
 Maddox, supra,
 
 46 Cal.2d 301, at page 306: ‘ ‘ Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guarantees are violated because an officer succeeds in getting
 
 *428
 
 to a place where he is entitled to he more quickly than he would, had he complied with section 844. ’’
 
 [7]
 

 The effect of
 
 Mapp
 
 v.
 
 Ohio
 
 remains to be considered. As stated in the concurring opinion in
 
 In re Harris,
 
 56 Cal.2d 879 [16 Cal.Rptr. 889, 366 P.2d 305], at page 881: “In
 
 Mapp
 
 v.
 
 Ohio, supra,
 
 81 S.Ct. 1684, however, the United States Supreme Court overruled the
 
 Wolf
 
 case and held ‘that all evidence obtained by searches and seizures in violation of the Constitution is, by the same authority, inadmissible in a state court.’ ” Since the facts in the present ease do not disclose a violation of the constitutionally protected right to be free from unreasonable searches and seizures, the defendant cannot find support for his position in the reasoning of the
 
 Mapp
 
 ease. (See
 
 People
 
 v.
 
 Tyler,
 
 193 Cal.App.2d 728, 734 [14 Cal.Rptr. 610].)
 

 With respect to the defendant’s second contention, the only statements of the defendant offered in evidence were those made orally at the house on the occasion of his arrest and, as far as the record discloses, within several hours thereafter at the police station in Santa Maria, except for what was said on May 16 at the quarters of the police department. However, after counsel for the defendant offered to prove that there had been an unlawful detention, the trial judge stated that he would assume that that was so for the purpose of his ruling, but that the objection to the admission of any conversations which were had with the defendant was overruled. There was no claim that any statement was involuntarily made. While it is not clear from the record that there was testimony as to anything said by the defendant during a
 
 *429
 
 period of unlawful detention (see
 
 People
 
 v.
 
 Dosier,
 
 180 Cal.App.2d 436, 441 [4 Cal.Rptr. 309]), the defendant contends that evidence of his statements should have been excluded because of his detention by the officers for a period of time beyond that permitted by law. Although his position is not supported by the record before this court, he appears to assert that there was a failure to comply with the provisions of section 849 of the Penal Code which section is in part as follows: “ (a) When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the oifense is triable, and a complaint stating the charge against the arrested person, must be laid before such magistrate.” (See also Pen. Code, §825.) The defendant places reliance on
 
 McNabb
 
 v.
 
 United States,
 
 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819], and asserts that the rule of exclusion therein expressed must be followed by virtue of the reasoning of
 
 Mapp
 
 v.
 
 Ohio, supra,
 
 367 U.S. 643. But such a determination is not compelled by the rationale of that case.
 
 (People
 
 v.
 
 Hanson,
 
 197 Cal.App.2d 658, 664 [17 Cal.Rptr. 334].) Even assuming that there is a factual basis for the defendant’s contention, there is no reason upon which to base a conclusion that the law of this state is no longer that expressed in
 
 Rogers
 
 v.
 
 Superior Court,
 
 46 Cal.2d 3 [291 P.2d 929], at pages 9-11, as follows: “In this state the admissibility of voluntary admissions or confessions made during illegal detention was first questioned in
 
 People
 
 v.
 
 Devine,
 
 46 Cal. 45, 48. The contention that voluntary conversations with the police officer illegally detaining defendant were inadmissible, solely by reason of the illegal detention, was rejected as unfounded in principle or authority. Since that time, however, the federal courts have adopted the rule that a confession during a period of illegal detention is inadmissible
 
 (McNabb
 
 v.
 
 United States,
 
 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819], rehearing denied, 319 U.S. 784 [63 S.Ct. 1322, 87 L.Ed. 1727];
 
 Upshaw
 
 v.
 
 United States,
 
 335 U.S. 410, 413 [69 S.Ct. 170, 93 L.Ed. 100]; ‘ [A] confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the “confession is the result of torture, physical or psychological.” ’
 
 United States
 
 v.
 
 Leviton,
 
 193 F.2d 848, 853), but, ‘ [T]he rule of the
 
 McNabb
 
 case, ... is not a limitation imposed by the Due Process Clause. [Citations.] Compliance with the
 
 McNabb
 
 
 *430
 
 rule is required in federal courts by [the Supreme Court] through its power of supervision over the procedure and practices of federal courts in the trial of criminal cases.’
 
 (Gallegos
 
 v.
 
 Nebraska,
 
 342 U.S. 55, 63, 64 [72 S.Ct. 141, 96 L.Ed. 86].) A pretrial confession is admissible, so far as due process is concerned, if it is voluntarily made.
 
 (Gallegos
 
 v.
 
 Nebraska, supra,
 
 342 U.S. 55, 65;
 
 Brown
 
 v.
 
 Mississippi,
 
 297 U.S. 278, 285, 286 [56 S.Ct. 461, 80 L.Ed. 682];
 
 Chambers
 
 v.
 
 Florida,
 
 309 U.S. 227, 236, 238 [60 S.Ct. 472, 84 L.Ed. 716];
 
 Lisenba
 
 v.
 
 California,
 
 314 U.S. 219, 238 [62 S.Ct. 280, 86 L.Ed. 166].) There is no contention in this case that the admissions were involuntary.
 

 “The test ordinarily used by state courts to determine the admissibility of a confession is, whether, considering all the circumstances, it was freely and voluntarily made without any inducement held out to the accused. (See 19 A.L.R.2d 1332, 1336-1346; 20 Am.Jur., Evidence, §482.) Since the
 
 MeNabb
 
 case, the state courts that have had occasion to reevaluate their test of admissibility as it applies to a confession made during illegal detention continue to treat delay in arraignment as only one of the factors to be considered in determining whether the statement was voluntarily made. Apparently none of the states following the rule excluding illegally obtained evidence have adopted the rule of the
 
 MeNabb
 
 case; and we are not disposed to adopt it.
 

 “There is a basic distinction between evidence seized in violation of the search and seizure provisions of the Constitution of the United States and the Constitution of California and the laws enacted thereunder, and voluntary statements made during a period of illegal detention. It may be true, as petitioner contends, that had he been arraigned within 48 hours and advised of his rights, he would not have volunteered to say anything. (Cf.
 
 People
 
 v.
 
 Stroble,
 
 36 Cal.2d 615, 626, 627 [226 P.2d 330]; and see
 
 People
 
 v.
 
 Zammora,
 
 66 Cal.App.2d 166, 220 [152 P.2d 180].) Nevertheless, there is lacking the essential connection between the illegal detention and the voluntary statements made during that detention that there is between the illegal search and the evidence obtained thereby, or between the coercion and the confession induced thereby. The voluntary admission is not a necessary product of the illegal detention; the evidence obtained by an illegal search or by a coerced confession is the necessary product of the search or of the coercion. When questioned by arresting officers a suspect may remain silent or make only such
 
 *431
 
 statements as serve his interest; the victim of an illegal search, however, has no opportunity to select the items to he taken by the rummaging officer
 
 (State
 
 v.
 
 Sanford, State
 
 v.
 
 Ellis,
 
 354 Mo. 998, 1012 [193 S.W.2d 37, 38] concurring opinion of Hyde, J.;
 
 State
 
 v.
 
 Guastamachio,
 
 137 Conn. 179 [75 A.2d 429, 431];
 
 cf., Milbourn
 
 v.
 
 State,
 
 212 Ind. 161 [8 N.E.2d 985, 986];
 
 Quan
 
 v.
 
 State,
 
 185 Miss. 513 [188 So. 568, 569]; 14 So.Cal.L.Rev. 477), and the victim of a coerced confession has been deprived of any choice. The record of the preliminary examination is devoid of any implication that the detention in this ease was resorted to for the purpose of inducing the admissions, and petitioner makes no contention that they were not freely and voluntarily made. Accordingly, since there is no evidence that the illegal detention produced the admissions, we find the exclusionary rule inapplicable.” (See also
 
 People
 
 v.
 
 Grace,
 
 166 Cal.App.2d 68, 72 [332 P.2d 811];
 
 People
 
 v.
 
 Teitelbaum,
 
 163 Cal.App.2d 184, 211 [329 P.2d 157].)
 

 The judgment and the order denying the motion for a new trial are affirmed.
 

 Files, J., concurred.
 

 Shinn, P. J., concurred in the judgment.
 

 A petition for a rehearing was denied July 31, 1962, and appellant’s petition for a hearing by the Supreme Court was denied August 29, 1962.
 

 [1]
 

 In the notice of appeal, it is also stated that the defendant appeals from “the order for probation.“ However, under the provisions of section 1237 of the Penal Code an order granting probation is deemed to be a final judgment from which an appeal may be taken.
 

 [2]
 

 Section 844 of the Penal Code is as follows: “To make an arrest, a private person, if the ofíense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person .to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired. ’
 
 ’
 

 [3]
 

 Part of Officer Martinez’ testimony given out of the presence of the jury was as follows: “Q. Now, you also testified before the jury that you did not see Mr. Sandoval leave the home. A. That’s right, sir. Q. I understood just a few minutes ago that you testified that you saw him leave the home; is that incorrect? A. You didn’t hear me testify that way, sir. The Court: No. Q. By Mr. Christiansen [counsel for the defendant]: What did you testify when he was running from the house on May 12th? A. I just said when I saw him running he was in the vicinity, or, he was in front of the house when I first saw him running in the yard of Mr. Gauthier. Q. And you didn’t see him actually enter or leave this particular house? A. I didn’t see the door open or close. Q. You didn’t see him on the porch of the house? A. No, sir. I saw him below on the lawn. Q. Were you south of the house at the time that you saw him? A. Yes, sir. Q. And then you say you picked him up at the corner? A. Yes, sir. I picked him up at the comer.”
 

 [4]
 

 The defendant directs attention to the fact that the officers first entered another house and then went to the defendant’s house. Explanations, however, were offered by Officers Mannin and Shoemaker. Officer Mannin testified in part as follows: ‘‘Q. Did you go directly from your vehicle to the defendant’s house? A. Ño, sir, I did not. Q. Where did you go in between? A. I started, frankly, toward the wrong house. Q. Why had you gone toward the wrong house? A. I misunderstood Agent Martinez. Q. Did you enter the other house? A. Yes, sir, I did. . . . Q. What happened? Did you knock at the other house door? A. No, sir. I entered the other house, and there was a gray-haired woman, I assume to be in her middle fifties. She said, ‘You got the wrong house. It is the people down the end of the block, is the ones you want. ’ . . . Q. You didn’t identify yourself as a narcotic agent or otherwise? A. No, sir. I entered through the back door and I was going through the kitchen portion of the house, as I recall. She told me I was in the wrong house, I was supposed to be in the house on the end of the block, and I said, ‘Thank you,’ and I kept right on going out the front door. Q. So you went to the house on the end of the block? A. Yes, sir. Q. On her advice? A. No, sir. I realized it was my error.”
 

 Agent Shoemaker testified in part as follows: ‘ ‘ Q. Then how did you proceed to the defendant’s house? A. We went and, I believe, in my, I believe, my State vehicle and parked approximately in this area right here (indicating on diagram). Q. Agent Mannin was with you? A. Yes, sir. Q. Then what did you do? A. Agent Orosco and myself also entered the wrong house. We had had 776 under surveillance for several months in the past on various occasions, although there was some confusion, which I was responsible for to a degree, and, exactly the color of the house and which house it was, and when I approached the front door of this house, I identified myself and an elderly lady in the house said, ‘It’s the house on the end.’ How she was aware of this, I do not know, but we went to the end house then. Q. Did you enter the house without knocking? A. Which house is that? Q. The location where the elderly woman was located? A. The front door was open, and this lady and her husband was standing in the front room. Q. Agent Mannin had already entered? A. No, sir. Agent Mannin went to the rear and I did not see him. By that time we left and were on our way to the correct house. Q. You then went to the defendant’s house on foot? A. Yes, sir.”
 

 [5]
 

 In stating the defendant’s position in the trial court, his counsel said in part as follows: “I am not saying and this is not my position that they did not have reason to believe that a felony had been committed within the premises. . . . Tour Honor, my objection will be this—will be that because of the breaking and entering there was an unlawful arrest made within the premises. At this time I am not making any objection to the fact that the agents may have had reasonable cause to know that a felony had been eonnnitted, ”
 

 [6]
 

 It is further to be noted that at page 313 of the opinion, Hr. Justice Brennan stated: “ Congress, codifying a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of the law for the individual’s right of privacy in his house.”
 

 [7]
 

 Support for the view that under the federal statute an exception would be recognized where destruction of evidence is imminent is found in the concurring opinion of Circuit Judge Pope in
 
 Leahy
 
 v.
 
 United States,
 
 272 F.2d 4S7. Part of his statement, at page 491, is: “But I think the evidence here in question was properly received for another reason. The arrest here followed other arrests and a search pursuant to a search warrant at another betting location. There the occupants had warning of what was up as the agents first announced they were federal officers and then broke the door with a sledge hammer. By the time they got in the room was full of smoke from the betting sheets and papers which had been set on fire. In my view, in a case of this kind, we can take judicial notice that when an attempt is made by officers to enter a betting parlor, there will be an attempt to destroy evidence if the operators have warning. For this reason we have here the exceptional ease suggested or referred to in
 
 Miller
 
 v.
 
 United States, supra
 
 (357 U.S. at page 309, 78 S.Ct. at page 1195),
 
 United States
 
 v.
 
 Jeffers,
 
 342 U.S. 48, 52 [72 S.Ct. 93, 95, 96 L.Ed. 59], and
 
 Johnson
 
 v.
 
 United States,
 
 333 U.S. 10, 15 [68 S.Ct. 367, 369, 92 L.Ed. 436], I think the obvious danger of another bonfire of evidence was sufficient warrant for what was done here.
 
 ’ ’